LOEHR, Respondent, vs. DICKSON, Appellant.

*October 12, 1912—January 7, 1913.*

*Vendor and purchaser of land: Strict foreclosure of contract: Redemption: Concealment of vendor, preventing payment or tender: Extension of time: Evidence: Unsupported verdict: Appeal: Costs for printing: Striking brief from files: Determination of cause: Counterclaim.*

1. In an action to recover damages, based on defendant's alleged fraudulent concealment of himself whereby plaintiff was prevented from paying or tendering the amount necessary to redeem certain lands in compliance with the terms of a judgment of strict foreclosure of a land contract, it is *held*, contrary to findings by the jury, that there was no evidence tending to show that defendant ever concealed himself or rendered a tender impossible or that plaintiff used reasonable diligence in an effort to find the defendant.

2. Plaintiff having alleged and the jury having found that a third person had paid him $70,000 for his rights and interest in the property covered by the land contract, a part of which sum he was ready and willing to pay to defendant to redeem the land, the evidence as to such payment and as to the existence of such third person, tending to show that he was a myth, is discussed, and it is suggested that the finding of the jury in that regard might properly have been set aside in the interest of justice.

3. A conversation in which, on August 23d, the last day for redemption, at the request of a person acting for plaintiff, defendant agreed to call at plaintiff's office on the afternoon of the next day and settle the matter up, might at most be held to amount to an agreement to extend the time 'for redemption until the afternoon of August 24th and for a sufficient length of time thereafter to enable the plaintiff to call on the defendant and make a legal tender to him, when he found that defendant did not keep the agreement to call at his office, but could not be construed as amounting to an agreement to extend such time from August 23d to August 28th.

4. Appellant's printed case and brief in this case being of unnecessary length and failing to comply with the rules of this court, no costs for the printing thereof are allowed.

5. A brief, "the great part of which can only be characterized as buffoonery," is stricken from the files and no costs allowed for the printing thereof.
6. Recovery upon a counterclaim is denied by the mandate in this case, there having been no finding of damages thereon in the trial court, and the record upon appeal not showing that defendant was entitled to recover.

APPEAL from a judgment of the circuit court for Milwaukee county: J. C. LUDWIG, Circuit Judge. *Reversed.*

In the year 1902 plaintiff contracted to buy certain property of the defendant, designated as Spring Bank, for $53,000. Plaintiff paid $2,000 in cash on the contract and later made other payments. To secure another payment he conveyed to the defendant certain land in Nebraska, valued at $2,000, as collateral security, and also deeded outright to the defendant certain other real estate. Plaintiff was unable to meet his payments as they fell due under the contract of sale and the defendant commenced a foreclosure action, in which judgment of strict foreclosure was rendered in February, 1905, which judgment was reversed by this court January 9, 1906.

This action was brought by the plaintiff to recover damages from the defendant resulting from the defendant's concealing himself so that plaintiff, within the time limited, could not comply with the terms of the judgment entered in accordance with the mandate of this court.

On the trial of the case the jury returned the following verdict:

"(1) Did Clarence R. Smith pay and turn over to plaintiff, *Oscar Loehr,* on or before August 23, 1906, $70,000 in purchase of the rights and interest of plaintiff in the Spring Bank property? *A.* Yes.

"(2) Was plaintiff, on and before August 23, 1906, able, ready, and willing to pay defendant the amount due to redeem Spring Bank, according to the judgment of the circuit court of Waukesha county, entered February 23, 1906? *A.* Yes.

"(3) If you answer the second question 'Yes,' then did plaintiff make reasonable effort to make or tender payment of the amount due to defendant, on and before August 23, 1906? *A.* Yes.

"(4) If you answer the second and third questions 'Yes,' did *David Dickson* conceal himself from plaintiff so as to render such payment or tender by, or on behalf of, the plaintiff, *Oscar Loehr,* impossible to be made on and before August 23, 1906? *A.* Yes.

"(5) Was the time for payment of the proper amount extended by *David Dickson* on or about August 23, 1906, for a few days? *A.* Yes.

"(6) If you answer the fifth question 'Yes,' was payment of the proper amount tendered by *Oscar Loehr* and refused by *David Dickson* within such extended time? *A.* Yes.

"(7) If you answer the fifth question 'Yes' and the sixth question 'No,' then was plaintiff, during such extended time and down to and·including August 28, 1906, able, ready, and willing to pay defendant the said amount due the defendant? *A.* Yes.

"(8) If you answer the seventh question 'Yes,' then did plaintiff, during such extended time and down to and including August 28, 1906, make reasonable effort to make or tender payment of the said amount to defendant? *A.* Yes.

"(9) If you answer the seventh and eighth questions 'Yes,' then did *David Dickson* conceal himself from plaintiff so as to render such payment or tender impossible to be made by, or on behalf of, the plaintiff, *Oscar Loehr,* during such extended time and down to and including August 28, 1906? *A.* Yes.

"(10) Did defendant, *David Dickson,* on August 23, 1906, agree with Richard Hedrick, acting for plaintiff, *Oscar Loehr,* to come to the office of the plaintiff on August 26, 1906, and to close the transaction at that time and place? *A.* Yes.

"(11) Did J. E. Wildish, for and in behalf of the defendant, on August 24, 1906, offer to the plaintiff to perform the contract on the part of the defendant? *A.* No.

"(12) If you answer the eleventh question 'Yes,' did the plaintiff, upon such offer, state to said Wildish that he was not ready? *A.* No."

The parties stipulated that the court should determine from the evidence and assess the amount of damages which the plaintiff was entitled to recover, if entitled to recover anything on the verdict, and accordingly the court made the assessment of damages, the amount awarded being $12,872.15 damages, together with the costs in the action, amounting in all to $13,005.30. The defendant was further directed by the judgment to reconvey to the plaintiff, by good and sufficient deed containing covenants of warranty against the acts of the defendant, the Nebraska lands which had been theretofore conveyed to said defendant as collateral security for the payment of one of the instalments due upon the contract. From this judgment the defendant appeals.

*J. E. Wildish,* for the appellant.

For the respondent there was a brief by *Harper & McMynn,* and oral argument by *R. N. McMynn.*

The following opinion was filed October 29, 1912:

BARNES, J. The defendant in this action brought an action against the present plaintiff in the year 1904 to foreclose a land contract. A judgment of foreclosure was entered in the circuit court, by the terms of which the defendant was allowed but ten days from the entry of the judgment in which to redeem. On an appeal from such judgment this court held that the time for redemption was unreasonably short and reversed the judgment with direction to enter a new judgment allowing the defendant six months from the date of entry thereof in which to redeem. This case is reported, *Dickson v. Loehr,* 126 Wis. 641, 106 N. W. 793. On February 23, 1906, judgment was perfected in accordance with the mandate of this court. Redemption was not made within six months from February 23d. After the period of redemption had expired the present action was brought to recover damages against the defendant because the latter had fraudulently concealed himself so that it was impossible for the

plaintiff to find him and make the necessary tender of the amount which the judgment required should be paid in order to entitle the plaintiff to a conveyance of the premises and personal property covered by the land contract. The amended complaint alleged ability, readiness, and willingness to pay, the fraudulent concealment of the defendant so that payment was impossible, and a sale of the premises by the plaintiff for $9,868.76 more than was necessary to pay to redeem from the judgment, and demanded judgment for damages in the sum of $12,068.76 in the aggregate. A demurrer was interposed to this complaint which was sustained by the circuit court. The order sustaining the demurrer was reversed on an appeal to this court, and this appeal is reported, *Loehr v. Dickson,* 141 Wis. 332, 124 N. W. 293. This court held in substance that it was plainly the intention of the pleader to state a cause of action in tort, and that the complaint did not state a good cause of action in tort. It further held, however, that the defendant was under a contractual obligation not to secrete himself so as to render it impossible for the plaintiff to find him and make the necessary tender, and that inasmuch as the complaint contained sufficient averments to show such obligation and a breach thereof, the complaint stated a good cause of action on contract. After the reversal of the order in question, a jury trial was had which resulted in a judgment against the defendant for $13,005.30.

The issues tendered by the amended complaint which was before this court on demurrer were much narrower than those litigated on the trial. That complaint set forth that *Dickson* kept in concealment until the last day on which redemption could be made, when he was found by an agent of the plaintiff who was searching for him, and that defendant thereupon agreed to call at plaintiff's office on the following day to settle the matter up, but that instead of doing so he went into hiding so that plaintiff could not find him during the remainder of the month. It was further set forth that the purchaser from

the plaintiff thereupon demanded back the $70,000 which he had paid plaintiff on account of the purchase and thereafter plaintiff was unable to secure the $60,131.24 necessary to redeem.

On the trial plaintiff testified that he and the purchaser, one Clarence R. Smith, did in fact find the defendant on August 28th in one of the railway depots in Milwaukee, and that he tendered the necessary amount to redeem and defendant refused to accept the tender on the ground that it came too late, and that immediately thereafter Smith demanded and received back the $70,000 he had paid plaintiff for a good title to the property and departed from Milwaukee and had not been heard from since. It is also claimed that there was testimony tending to show that the defendant extended the time for making the tender for a few days from August 23d, and the complaint was amended after the parties had rested to conform to the proofs above referred to.

The material issues in the case were: (1) Was plaintiff able and willing to pay the amount necessary to redeem prior to August 24, 1906? (2) Did defendant conceal himself so as to render tender or payment impossible? (3) Was the period of redemption extended beyond August 23d? (4) If so, was a tender made within the period covered by the extension? and (5) Did defendant conceal himself so as to prevent a tender within the period covered by the extension?

The jury found that there was such a person as Clarence R. Smith and that he had paid plaintiff $70,000 for the property covered by the land contract referred to, and that plaintiff was ready, willing, and able to pay the $60,131.24 necessary to redeem on and before August 23, 1906. These findings are supported by the evidence of the plaintiff and by that of the witnesses Scharel, Mueller, and Hedrick, and there is some corroboration of their evidence by other witnesses. Notwithstanding this array of witnesses, it is seldom that a case comes to this court which presents so many ear-

marks of having been established by perjured testimony as does the one before us. It requires an abiding faith in the integrity of witnesses to believe that the mysterious and elusive Dr. Clarence R. Smith was not a myth invented to meet the necessities of the case if plaintiff was to stand any show of recovery. The recondite H. H. Hayward involved in *Dorwin v. Hagerty,* 137 Wis. 161, 118 N. W. 799, seems to have found a counterpart in Dr. Smith.

It is not our purpose to enumerate with much detail the various considerations which tend to show that Smith was a dummy rigged up for the occasion. We do not find it necessary, in order to do substantial justice in this case, to say that he did not exist or that he did not pay $70,000 to the plaintiff.

The plaintiff testified that in 1901 he met Dr. Smith several times in the lobby of a hotel at Vancouver, British Columbia, and that they rode together on a train from there to St. Paul, and that Dr. Smith seemed to be very much interested in sanitariums. Plaintiff did not make his contract with defendant until 1902. He further testified that Smith came to Milwaukee and called on him in 1902 and again in 1903 and went out to see the property covered by the contract with defendant. Smith was next accidentally and opportunely met on the streets of New York about February 21, 1906, when the plaintiff was returning from a six months' trip to Europe. In New York they talked about the sanitarium and then came to Chicago together. Smith stayed over one night in Chicago and came to Milwaukee the next morning, and apparently returned to Chicago the next night and made a pilgrimage back to Milwaukee the following day. He seemed to have had a great aversion to Milwaukee hotels, because, even as early as 1903, on the occasion of his visit to Milwaukee, he apparently went to Chicago to spend the night, returning the following day. Plaintiff testified that during the visit to Milwaukee in February, 1906, Smith took an option on the property for

$70,000, paying $1,000 therefor. Some time in June he wrote plaintiff that he would come to close the deal. Plaintiff thinks this letter was written from Winnipeg, but the letter was not preserved. The option which plaintiff gave Smith was drafted by the latter, and he apparently forgot that he was a Canadian and gave his place of residence as the "State of Manitoba." In his examination under sec. 4096, Stats., plaintiff said that this option was given in July instead of in February. On the same examination plaintiff testified that on July 5th Smith paid him something over $60,000 on the purchase, taking back as security a note secured by a trust mortgage. On the trial he said the money was paid on July 16th. During none of these important negotiations was any lawyer consulted or employed by either of the parties. Then the search for *Dickson* was prosecuted with unremitting vigor, but was confined to looking for him where he did not happen to be. According to the evidence Smith was in Milwaukee most of the time between July 5th and August 28th, but his aversion to Milwaukee hostelries continued. He apparently preferred to spend his summer nights in Chicago or at or near Racine, and it was plaintiff's belief that he did not favor Milwaukee to the extent of spending a single night there. Neither did plaintiff know of a single hotel any place where Smith had registered, unless it might be at the Waldorf Astoria in New York, and he did not know whether Smith ever registered there or not. The alleged search for *Dickson* continued down to August 21st, but he had apparently vanished. Notwithstanding this and the fact that the time to redeem would expire on August 23d, Smith paid to plaintiff the balance of the $70,000, or nearly $9,000 in excess of the amount theretofore paid. Although plaintiff kept a bank account, he neither deposited the first payment of over $60,000 nor the second one of about $9,000. It was not claimed that there was any necessity for keeping the second amount handy so as to be prepared to tender it to *Dickson*. Plaintiff testi-

fied on his examination under sec. 4096 that he kept the first payment in a satchel from July 5th until August 28th, which was in his office during the day and at his home at night, and that he had the money with him all the time. On the trial he testified that the first payment was not made until July 16th, and that most of the time he kept the money in a safe in the house of the witness Scharel. Plaintiff further testified that both payments were made in currency. No real attempt was made to find *Dickson,* although, according to plaintiff's evidence, he was interested in finding him to the extent of about $9,000. The evidence on this point will be discussed later. After August 28, 1906, Dr. Smith vanished as completely as Charlie Ross. It would seem that a doctor who had a penchant for sanitariums and who had enough of this world's goods to carry $70,000 around with him ought to be easily located even in such a city as Winnipeg or Vancouver. If the doctor had passed away or had removed, others should have been found who knew him or knew of him. The story was so extraordinary that the court might well look to the plaintiff to furnish this proof. It would be difficult to establish the negative, because plaintiff was either unfortunate in not knowing more about his friend or cautious in not committing himself as to any particular place where the doctor resided. Then, too, the doctor, for a man of means, was as careless about intrusting a large sum of money to a stranger as that stranger was about handling and caring for it after he got it. Just why the doctor advanced $60,000 before *Dickson* was found, so that a tender could be made to him, and why he advanced plaintiff $9,000 more practically without security on August 21st, two days before the period of redemption expired, when he and plaintiff had been diligently looking for the defendant without success since July 5th, are circumstances that call for some better explanation than has been attempted. We have given but a brief outline of the evidence tending to show the mythical character of Smith and do not

find it necessary to pursue this subject farther, as we do not hold that the first and second findings of the jury should be set aside because not supported by any credible evidence.     We think the case was one where the trial court might well have exercised the broad discretion vested in it and set aside the verdict on the ground that the promotion of justice demanded such action, even though no other reason was apparent to the court for taking such course.     Courts sit for the purpose of seeing that justice is secured by litigants.     In carrying out this important function they should see to it so far as they can that litigants are not rewarded for committing the crime of perjury, by favorable judgments.

We now come to the question whether other findings of the jury essential to sustain the judgment rendered are supported by any evidence whatever.     The fourth finding will first be considered.     By it the jury found that the defendant concealed himself so as to render tender or payment by the plaintiff impossible.     The character of the evidence offered to support this finding and which it is claimed does support it may be briefly summed up:

The defendant's home was in Milwaukee.     The plaintiff testified that during the months of July and August, 1906, he wrote numerous letters properly addressed to the defendant at his street number, that they were properly mailed, and that in them he informed the defendant that he was ready to pay up the amount required by the judgment and asked the defendant to meet him for that purpose, and that none of these letters were returned; that plaintiff also drafted a number of notices to the same effect and either carried them personally or sent them by messenger to defendant's house and that the same were pushed under the door of the house; that plaintiff made some sixteen trips to the house during the time stated, for the purpose of seeing him and arranging a settlement; that Smith made numerous trips for the same purpose, as did Scharel, Mueller, and Hedrick; that inquiries were made of a woman

who lived near *Dickson's* house, as to his whereabouts, and that she was unable to give the desired information; that inquiry was also made of a saloonkeeper in the vicinity and he replied that he did not know *Dickson;* that plaintiff attempted to call *Dickson* by telephone at his house a number of times; that some one in the interest of plaintiff made inquiry at the Pabst building, where defendant formerly had an office; that an attempt was made to get Wildish, the defendant's attorney, by telephone, but the party seeking to communicate with him was unable to do so because Wildish was out at the time. of the inquiry; that a representative of the plaintiff called at Wildish's office on the 21st or 22d of August for the same purpose and again found that he was out, and finally that plaintiff on the 3d of July offered a messenger boy $2 if he would find *Dickson* for him.    It was further testified that no answer was received to the various letters or notices and that none of the letters were returned, although there were directions thereon for return in case of nondelivery.   It was also testified that one night when the plaintiff attempted to locate *Dickson* a light was observed in the house and that it was turned out when plaintiff attempted to get in.

Notwithstanding this testimony, we do not think there was a scintilla of evidence in the case which either showed or tended to show that *Dickson* was in hiding or that he concealed himself so as to make a tender impossible.   It is rather strange that these frequent visits should be made to a house that was closed and to a house that was obviously unoccupied. It is established beyond dispute that *Dickson* closed his house in May or the fore part of June and kept the same closed until October, except as he occasionally might have visited it when he came to Milwaukee; that he with his family moved out on the Spring Bank property near Okauchee, twenty-seven miles from Milwaukee, and lived there continuously and openly from June to October; that *Dickson* had occasion to go to Milwaukee frequently to attend to his business, and did go as fre-

quently as twice a week; that he collected rents from some thirty tenants during his trips there, and regularly made deposits in the Second Ward Savings Bank, and frequently visited a safety deposit company in which he had a couple of safety deposit boxes, and that occasionally he stayed over night in Milwaukee. There is not a shred of testimony to show that *Dickson* left Milwaukee for the purposes of concealment or that he did anything whatever to conceal himself during the months of July and August, or that he had any reason to believe that plaintiff intended to redeem when he moved to Spring Bank. There were valuable buildings on the Spring Bank property, which, by the way, was the property plaintiff had contracted to buy. By the terms of that contract the defendant had the right to the possession of the property until certain payments were made, which the plaintiff did not make. The plaintiff knew that the defendant's son had occupied the Spring Bank property formerly at least, and made no effort to ascertain whether he was still residing there. The plaintiff knew that one Mrs. Siemens was renting one of the buildings on the property for a summer cottage and knew her and her husband well, and made no inquiry from either of them as to where *Dickson* was. The plaintiff knew that Wildish was the attorney for *Dickson* in the litigation between them. The evidence showed that Wildish was at his office during the months of July and August, except as he might be away for an occasional day or so, and practically made no effort to ascertain from him where his client was, at least up to the 21st or 22d of August, and apparently very little if any effort was made then. Plaintiff knew that Judge Neelen lived in close proximity to *Dickson's* house, and he testifies that he asked the judge on one occasion whether *Dickson* was at home, but he did not take the trouble to ask him if he knew where *Dickson* was. No inquiry was made of *Dickson's* neighbors as to his whereabouts except as above stated. The plaintiff consulted no attorney as to the proper means of

finding *Dickson,* and neither did he consult any member of the sheriff's office or of the police force. The evidence as to *Dickson's* whereabouts was not only given by himself and members of his family, but by a number of wholly disinterested witnesses. There was practically the same evidence of hiding that might be shown in reference to any other resident of Milwaukee who lived out at one of its suburbs during the summer months. It is a little strange that plaintiff and his agents should make so many trips to a house that was closed up and unoccupied and do practically nothing else to find the defendant, when, according to plaintiff's testimony, so much depended on his being able to locate him. The only circumstance we have been able to find in the testimony at all tending to support the claim of the plaintiff is the fact that he said he wrote numerous letters and received no answer thereto. *Dickson* denied receiving any such letters. He was under no legal obligation to answer the letters, although it would have been a courteous thing for him to have done so had he received them. But *Loehr* knew at a very early date in July that his letters were not being answered, and still he persisted in sending letter after letter and notice after notice to the same place, and continued to make trip after trip day after day to the same house, which he knew to be closed up and unoccupied. He made no inquiries as to *Dickson's* whereabouts of any one who was likely to know, except it was of the woman who lived near him, and did nothing to ascertain his whereabouts that was at all calculated to produce results. On this state of the record we are unable to see where there is any evidence that it was impossible for plaintiff to make the tender because the defendant was in concealment.

We say, therefore, that this fourth finding of the jury must be set aside as not supported by any testimony. What has been said in reference to the fourth finding also applies to the third finding, by which the jury said that the plaintiff made reasonable efforts to tender payment of the amount due to the

defendant on or before August 23, 1906. We think it would have been a very easy matter for the plaintiff to find *Mr. Dickson* if he wanted to find him.

We next come to the consideration of the fifth finding of the jury, by which it was determined that on or about August 23, 1906, the defendant extended the time of redemption for a few days. Two different transactions are relied upon to support this finding. It is argued that the witness Hedrick found *Dickson* on the 23d of August and served a demand upon him on behalf of the plaintiff for a deed of the premises and satisfaction of a mortgage thereon and the assignment of insurance policies and certain other things which it is unnecessary to enumerate, and that at the time of serving such demand Hedrick requested the defendant to call at the plaintiff's office on the afternoon of the following day to settle the matter up, and that defendant agreed to do so but failed to keep his promise. *Dickson* denies making the appointment to meet the plaintiff, but says he did tell Hedrick that he would take the matter up with his attorney. In discussing this finding of the jury we shall assume that the testimony of Hedrick is true wherever there is any conflict between the witnesses, because the jury evidently believed his statement as to what conversation took place. There was no statement in the notice served that plaintiff was ready or willing to pay over the money, but perhaps it might be fairly implied from the demands contained in the notice, which, by the way, was not signed, that plaintiff was ready to pay. Construing this conversation most favorably to the plaintiff, it might be held to amount to an agreement to extend the period of redemption until the afternoon of August 24th and for a sufficient length of time thereafter to enable the plaintiff to call on the defendant and make a legal tender to him when he found that defendant did not keep his agreement to call at his office. But we fail to see how that conversation can be construed as amounting to an agreement to extend the time of redemption

from August 23d to August 28th, when the plaintiff insists that he actually made the tender. While the jury found that plaintiff was in concealment not only up to the 23d of August but also thereafter and until the 28th of August, we hold that there is no testimony in the record which shows that he was ever in concealment a single day or a single hour. So we dismiss the claim that the alleged agreement between Hedrick and *Dickson* on the 23d of August amounted to or was an agreement to extend the time of payment for a few days or until August 28th.

The second ground on which plaintiff seeks to support this finding of the jury arises out of an alleged transaction between Wildish, the defendant's attorney, and the plaintiff on the 24th of August. After Hedrick left the plaintiff's demand with *Dickson* on August 23d, the latter went to the office of Wildish and found that he was out and left the notice there with a memorandum in reference to it. Wildish testified that on the following morning he found the demand, started to draw some of the necessary papers in reference to the transfer, and then went over to *Loehr's* office and told him that the abstract would have to be carried down to date and that possibly a new abstract would have to be provided and a mortgage would have to be satisfied, and that it might take a few days within which to complete the transaction, and that he then told *Loehr* that *Dickson* was ready and willing to perform on his part and asked *Loehr* if he was ready to pay, and that *Loehr* told him he was not. *Loehr* does not deny this conversation except by saying that Wildish did not call at his office and that he did not have any such conversation with him on August 24th or at any other time. Counsel for respondent argues that the jury had a right to believe Wildish and to disbelieve *Loehr* and that it evidently did so as to this transaction, and that inasmuch as Wildish was *Dickson's* attorney he had a right to bind his client by extending the time within which payment might be made a sufficient length of time to

enable the parties to get the papers ready.    The trouble with the contention for the respondent is that the jury did not believe Wildish but did believe *Loehr*.    By the eleventh finding it found that Wildish did not on August 24, 1906, offer to perform the contract on the part of the defendant, and by the twelfth finding it found that the plaintiff did not say to Wildish that he was not ready to perform.    Now it may be said that the twelfth finding of the jury is supported by the testimony of other witnesses than the plaintiff, and that therefore it does not necessarily follow that the jury believed *Loehr's* evidence to be true when it answered that question.    This, however, cannot be said of the answer to the eleventh question. Wildish testified positively that he told *Loehr* the defendant was ready to perform.    There is absolutely no evidence in the record to dispute the testimony of Wildish that he did say so, except that of *Loehr* to the effect that Wildish was not in his office and that he did not have any conversation with him. There being evidence in the record which would warrant the jury in answering the eleventh question as it did, we must assume that it followed such evidence when it made its answer and that it found *Loehr's* testimony to be true.    Its answer to the fifth question was evidently given on the assumption that the conversation between Hedrick and *Dickson* warranted such a finding.

We therefore hold (1) that there was no evidence in the case tending to show that *Dickson* ever concealed himself or rendered it impossible for the plaintiff to find him and make a tender to him, or that plaintiff used reasonable diligence in an effort to find the defendant; (2) that there was no agreement made either on the 23d or on the 24th of August, or at any other time, to extend the time of payment to August 28th, when the alleged tender was made; (3) that defendant had the right to refuse the tender made on August 28th, if one was made, because the same was not made within the time prescribed by the judgment.    It follows from

these conclusions that no cause of action was proved by the plaintiff.

The printed case contains 909 pages of printed matter aside from a rather poorly prepared index. Nearly all of the evidence is printed by giving the questions and answers. Everything material and immaterial, important or trifling, is printed. Several hundred pages are devoted to irrelevant matter that could in no way be helpful to this court on any aspect of the case. There was no necessity for preparing a case to exceed 250 pages in length. This allowance is liberal. The appellant's brief contains 219 pages and gives no orderly presentation of the issues or of the things relied on by appellant to support his contentions. The lack of concentration and the rambling method of argument pursued in the brief rendered it necessary for the court to carefully read over the mass of relevant and irrelevant testimony printed in the case, in order to get a clear understanding of the issues between the parties and the evidence bearing on such issues. All the material questions raised by appellant could be fully treated in a fifty-page brief. If all the cases that come before this court were prepared and presented in the way this one has been, the court could not begin to keep up with its work. Rule 44 of this court is neither ornamental nor innocuous. Under it no costs will be allowed appellant for printing. *Gerbig v. Bell,* 143 Wis. 157, 126 N. W. 871, and cases cited.

*By the Court.*—The judgment of the circuit court is reversed, and the cause is remanded with directions to enter judgment dismissing the complaint. No costs for printing will be allowed.

The following opinion was filed December 10, 1912:

PER CURIAM. At the close of the testimony in this case the defendant was permitted to interpose a counterclaim in which he sought to recover damages in the sum of $2,000 from

the plaintiff. This counterclaim was not referred to in the opinion of the court. The appellant now moves the court for judgment on his counterclaim for the amount claimed therein with interest, and also asks this court to determine that the action is one in equity and to direct a taxation of costs in the trial court in favor of the appellant as in equitable actions.

The counterclaim was not treated in the opinion filed, because there was no finding of damages by the court or the jury, and because this court was of the opinion that the record did not show that the defendant was entitled to recover. The effect of the mandate in the case was to deny recovery on the counterclaim, and this is the effect which the court intended it should have.

For the present we will assume that the trial court will follow the law in the matter of awarding costs. The motion of the appellant is denied, with $10 costs.

The following opinion was filed January 7, 1913:

PER CURIAM. In support of his motion for a rehearing in this case the respondent has filed a brief which, though it has not convinced us of error, is, at least, entitled to be met by serious argument.

Instead of so meeting it, the appellant has served and filed a so-called brief consisting of nineteen pages of printed matter, the great part of which can only be characterized as buffoonery. An occasional play of wit is refreshing and sometimes illuminating even in a legal argument, but a brief is properly a field for the exercise of the highest reasoning powers and not for the exploitation of literary vaudeville.

The serving and filing of such a brief can only be considered as trifling with counsel and with the court. It will be stricken from the files and no costs will be taxed for printing it.

The appellant's brief is stricken from the files, and the motion for a rehearing is denied without costs.