ANDERSON, Appellant, vs. EGGERT and others, Respondents
[Four cases.]

*March 13—April 9, 1940.*

For the appellants there was a brief by *Eberlein & Eberlein* of Shawano, and oral argument by *M. G. Eberlein, Jr.,* and *M. G. Eberlein, Sr.*

For the respondent Alfred Eggert there were briefs by *Winter & Koehler* of Shawano, and oral argument by *P. J. Winter* and *H. E. Koehler.*

For the respondents Floyd and Sylvia Litzen there was a brief by *Wallrich & Aschenbrener* of Shawano, and oral argument by *E. L. Aschenbrener.*

For the respondent Maryland Casualty Company there were briefs by *Benton, Bosser, Becker & Parnell* of Appleton, and oral argument by *A. W. Parnell.*

ROSENBERRY, C. J. *Motions for Reversal.*

Alfred Eggert and the Maryland Casualty Company and Alfred Eggert, as administrator of the estate of Edna Eggert moved for a new trial. There was a similar motion by Floyd L. Litzen and by Sylvia Litzen. Anderson moved for judgment upon the verdict which was returned June 30, 1939. There was also a motion for a new trial on the ground that certain jurors had not truthfully answered questions asked them on the *voir dire* examination made by Floyd L. Litzen, Sylvia Litzen, and Eggert personally and as administrator. Combined with these were other motions to change the answers and the usual motions made in such cases. The motions were apparently heard together, the motion with respect to the misconduct of the jurors being supported by witnesses produced upon the examination who testified orally. At the

close of the hearing this motion was denied and it will receive no further consideration.

On August 18th, the witness produced on behalf of Anderson had been examined. Counsel for the plaintiffs Litzen asked for an adjournment for a sufficient time to enable the testimony of other witnesses to be produced, including that of one Jelinski. The court granted this motion and continued the hearing to the 31st day of August, 1939, at 2 o'clock in the afternoon. In connection with the granting of this continuance it was brought to the attention of the trial court that the adjournment was beyond the sixty-day period in which sec. 270.49, Stats., requires motions for a new trial to be decided. Thereupon counsel for Eggert attempted to comply with the statute and filed an affidavit in which, among other things, it was alleged:

"That it is necessary that the court make an order at this time extending the time for hearing and deciding such motions; that at said hearing on August 14, 1939, it was stated by this affiant in open court, in presence of the other attorneys, that it would be necessary to extend the time for hearing and deciding said motions, at which time it was suggested by the court that an order be prepared extending the time for the reason that cause, therefore, existed; that this affidavit is made for the purpose of procuring the entry of a written order extending such time for a period of sixty (60) days."

This was certainly a weak attempt to comply with the statute which requires cause to be shown. The order made on August 25, 1939, and so within the sixty-day period, contained the following recital:

"Upon the affidavit hereto annexed, and upon all the proceedings had in the above-entitled actions, from which it satisfactorily appears that cause exists for extending the time for hearing and deciding the motions for new trials in said actions, and the court being fully advised in the premises.

"It is, therefore, ordered:

"That the time within which the various motions for new trial filed in the above-entitled actions by the several parties

shall be heard and decided, is hereby extended for a period of sixty (60) days beyond the time otherwise provided."

If it were the intention of the parties to keep the cause for a continuance a secret, success marked their efforts. It can only be discovered by a search of the record. Good practice requires that the cause for extension should appear in the order. It seems incredible after what has been said that counsel will not obey the plain commands of the statute after it has been repeatedly pointed out in the decisions of this court that not only must there be good cause but the cause itself must be shown. A mere recital that an extension is granted for cause, for convenience, or because someone wants it or someone stipulated that it be granted, is not a compliance with the statute.

Upon the argument in this court the appellant Anderson moved for reversal because the order granting a new trial was not decided within sixty days from the rendition of the verdict, no valid order extending the time having been made as required under 'sec. 270.49, Stats. This motion raises the following question: It appearing from the record that the motions for a new trial on the minutes of the judge and for misconduct of the jury were being considered together, and it appearing that it was necessary to adjourn the hearing in order to procure the attendance of witnesses with respect to the alleged misconduct of the jurors, and the order extending the time containing a recital that it is made upon the affidavit, the record, and the proceedings in the case, Does the cause for adjournment sufficiently appear of record so that there is a compliance with the statutory provision? If the procuring of witnesses to testify with reference to the alleged misconduct of the jurors was a cause, then the cause did not continue for a second sixty-day period. The motions were heard and the examination completed on August 31st. The court, however, did not make its decision until October 23d and the formal order denying a new trial was not entered until October 28th.

In *Beck v. Fond du Lac Highway Committee* (1939), 231 Wis. 593, 597, 286 N. W. 64, this matter was considered, prior cases cited, and the court said:

"The cases [citing] are all to the effect that good cause must be shown and that the order must recite facts which constitute good cause. It is our conclusion that good cause was not shown by the petition. All the petition amounts to is a statement that petitioner needs more time. This is a conclusion which omits the premises upon which it is based. The order itself contains no recitation even of the conclusion that good cause has been shown."

So important a statutory provision as sec. 270.49, Stats., should be carefully complied with. It was enacted by the legislature for the purpose of requiring courts in the interest of a sound public policy to administer justice "promptly and without delay" in accordance with the constitutional mandate. (Sec. 9, art. I.) Not infrequently cases come to this court where the delay in reaching a final decision has been so great that there is in practical effect a denial of justice. The determinations of this court are not based upon public clamor about delay in the administration of justice in the state of Wisconsin but upon the constitutional and statutory mandates.

It is possible that a review of the history of this statute may be helpful. This provision had its origin in sec. 174, ch. 120, Laws of 1856, which abolished existing forms of actions and established a uniform course of procedure. This section became sec. 16 of ch. 132, Stats. 1858, and was as follows:

". . . The judge who tries the cause may in his discretion entertain a motion to be made on his minutes, to set aside a verdict, and grant a new trial, upon exceptions, or for insufficient evidence, or for excessive damages; but such motions in actions hereafter tried, if heard upon the minutes, can only be heard at the same term or circuit at which the trial is heard. . . ."

By the revision in 1878, this section became sec. 2878, Stats., with slight immaterial verbal changes. Sec. 2878 was amended by ch. 100, Laws of 1901, by adding:

"If such motion be made, but not decided during such term, it shall be taken as overruled, and an exception to such constructive denial of the same shall be allowed in the bill of exceptions."

The section was amended by ch. 477, Laws of 1917, which substituted for the term provision, the following:

"But such motion if heard upon the minutes must be made and heard within sixty days after the verdict is rendered, unless the court by order shall extend such time for cause."

At the same time the statute was further amended by ch. 477, Laws of 1917, the following sentence being added:

"If such motion be made, but not decided during said sixty days or within such time as the court shall have fixed in such extension, then such motion shall be taken as overruled, and an exception to such constructive denial of the same shall be allowed in the bill of exceptions."

The emphatic language of the 1917 amendment which requires the motion to be made and heard within sixty days or within the extended time was due no doubt to the fact that under the statute as it formerly stood, the time might be extended by stipulation of the parties. *Steinhofel v. Chicago, M. & St. P. R. Co.* (1896) 92 Wis. 123, 65 N. W. 852. Since the amendment in 1917, it has been consistently held that in the absence of an order extending the time for cause, the trial court is without jurisdiction to set aside a verdict and order a new trial upon his minutes after the expiration of the sixty-day period. *Ward v. Smith* (1917), 166 Wis. 342, 165 N. W. 299.

In endeavoring to enforce compliance with the statutory and constitutional commands this court is carrying out the established declared public policy of the state. The court is not inclined to relax or fritter away this highly beneficial statute.

The statute makes no provision with respect to procedure where cause exists for an extension of the time within which to decide the motion after an extension has been once granted. It is, however, a plain inference from the statutory provision that the time should not be extended beyond the time for which cause exists. If by once extending the time the court and counsel are freed from the operation of the statute, the whole legislative purpose will be defeated. The purpose of the statute is to procure a prompt decision. In this case it is considered that it sufficiently appears from recitals and the record that the cause for the extension of the time was to enable the parties to produce necessary and proper witnesses. These witnesses were produced and heard on August 31st, seven weeks before the decision was rendered. The court ordered the time extended for sixty days. No cause appears of record for extending the time beyond the time when the witnesses could be produced. However, under the peculiar facts and circumstances of this case, it appearing the court could not know within what time the witnesses could be produced, and being obliged to act before the time required could be ascertained, there having been a reasonably prompt compliance, it is considered that the motion for reversal because of failure to comply with the provisions of sec. 270.49, Stats., should be denied.

### Merits.

We now turn to a consideration of the case upon the merits.

The facts in this case present a situation not common in automobile accident litigation. It is the contention of A. O. Anderson, the appellant (he will hereinafter be referred to as "appellant" because there are a number of plaintiffs), that on the 18th day of December, 1938, at about 4 o'clock in the afternoon he was driving north on County Trunk Highway G in the county of Shawano. It appears without dispute that about two hours previous to the time of collision

he had gone from north to south upon this highway to interview a man and was returning when the accident happened. He was riding alone in his Ford coupe, and contends that he saw the Eggert car when it was still a long distance away, lost sight of it as it went into hollows, and caught sight of it as it came up on the rises, the country being rolling. He testifies that the Eggert car was constantly within his view from a time when it was about two hundred fifty feet away. At that time he testifies that he turned his car to the right, the Eggert car being on his right or the east side of the highway; that the Eggert car continued to come toward him whereupon he turned his car to the extreme right or east of the highway and was at or near the bank on the east side of the highway when his car was struck by the Eggert car. Stanley Brown, county traffic officer for Shawano county, arrived at the scene of the accident about one-half hour after the accident. By measurement he ascertained that the road was twenty-four feet eight inches wide. In the center there was black-top of an uneven width, being from eleven to fourteen feet wide.

The respondents claim that just shortly before the accident Eggert was traveling south upon County Trunk Highway G driving his car, a two-door Plymouth. With him were Dr. Litzen, Mrs. Litzen, and Mrs. Eggert. Dr. Litzen sat on the right side of Eggert in the front seat, Mrs. Litzen sat in the rear seat on the right side, and Mrs. Eggert sat in the rear seat on the left side behind her husband. Eggert testifies that he first saw the Anderson car when he was from fifty to seventy feet away. He was traveling south at a speed of thirty-five to forty miles an hour. He said:

"If I remember, as soon as I saw the car it was in front of me and we hit. It was not just a matter of seeing part of the car, it was a matter of seeing the car and then we hit."

Eggert claims that Anderson was entirely upon Eggert's right or west side of the highway, and that the collision occurred on that side. Dr. Litzen suffered a complete loss of

memory as a result of his injuries which were very severe. Mrs. Litzen testified upon the trial, but her testimony taken as a whole is so contradictory as to have little, if any, probative value. In addition to that her position in the car was such that her opportunity for observation was limited. Neither Eggert nor Anderson lost consciousness. Anderson, however, sustained severe injuries, having suffered a fracture of his left leg.

The peculiarity of this case is this: A determination of where the collision took place in effect determines the question of liability. There is no middle course. Each side relies upon the physical facts to establish the truth of its contention. The trial court was of the view that "the preponderance of the evidence showed facts inconsistent with the claims of Mr. Anderson," and set aside the verdict upon three grounds: (a) The court erred in the admission of evidence; (b) the verdict was contrary to the clear preponderance of credible evidence; and (c) a new trial must be granted in the interest of justice. The court filed an opinion in which he expressed the belief that the jury might have been prejudiced against Eggert because of his attitude on the witness stand. The court said:

"He appeared to adopt a supercilious, debonair and egotistical attitude which was wholly incompatible with the importance of the action, and with his position as a recently bereaved husband whose wife had met her death in the accident into which inquiry was being made."

The trial court's conclusion that the court erred in the admission of evidence relates to the testimony of the expert witnesses, John R. Roebuck and W. F. Steve, who are professors in the department of physics at the University of Wisconsin. The testimony of these witnesses was strenuously objected to by counsel for the other parties. The question is, Were the matters about which they testified proper subjects for expert testimony? No claim is made that the

witnesses Roebuck and Steve were not competent physicists. The principal objection made upon the trial and emphasized here is that the testimony given by these witnesses invaded the province of the jury in that the witnesses testified upon "the very issues which the jury had to determine." This is an objection met in almost every case where the admissibility of expert testimony is in question. Cases can be found on both sides of almost every aspect of this question. The language of the opinions must be carefully considered with reference to the facts involved. Most expert testimony properly received in the cases deals with questions which the jury will be called upon to determine. Whether a dose of poison caused the death, whether the wound received was fatal, what the reaction of two chemical reagents would be, whether a dangerous condition of a boiler tube should have been discovered, are all matters upon which a jury will be required to pass. Whether in a particular case the opinion of a witness should be received is a matter which rests very largely within the discretion of the trial court. *Lyon v. Grand Rapids* (1904), 121 Wis. 609, 619, 99 N. W. 311. In many courts it is held that the qualification of an expert, that is, whether by reason of special skill or knowledge he can be of assistance to the jury, is a matter wholly for the trial court. 1 Wigmore, Evidence (2d ed.), p. 963, § 561.

The trial court having in the exercise of its discretion permitted the expert witnesses to testify, the question is, Did the trial court in so doing abuse its discretion? The court in its opinion said:

"It is my opinion that the matters concerning which the learned professors testified are as much a matter of common knowledge as of scientific learning; the humblest workman or backwoodsman has a workable knowledge of the laws of imparted force. . . . They are so easily demonstrable that it is not only unnecessary for experts to be called to testify to them, but, in the opinion of the court, it is a clear invasion of the province of the jury to allow such testimony."

In reaching this decision the court was no doubt influenced by *Goetz v. Herzog* (1933), 210 Wis. 494, 498, 246 N. W. 573. The *Goetz Case* was an automobile case. A qualified teacher of physics was asked to state the law of physics as to imparted force, objection was sustained on the ground that he had had no experience with colliding automobiles. This court said:

"This law is doubtless as well known, as much a matter of common knowledge, as the law of inertia, the contended effect of which the proffered evidence was offered to refute. . . . If not as well understood by the jury as the law of inertia, its effect was readily subject to illustration in argument."

It was held that the trial court in excluding the evidence offered did not commit error. It is not said that it would have been error to admit it.

In *Maitland v. Gilbert Paper Co.* (1897) 97 Wis. 476, 72 N. W. 1127, it was said in effect that so long as the opinion of the expert upon undisputed facts or an assumed state of facts was warranted by the evidence or some aspects thereof and is kept within the field of scientific knowledge, the question calling therefor is not objectionable necessarily because the tendency of the answer is to pass upon some ultimate question for solution. See *Lyon v. Grand Rapids, supra.*

This doctrine has been approved in many other cases. The expert witnesses in this case were not asked to state the laws of physics, but on the contrary were asked hypothetical questions based upon facts appearing in the evidence. They were asked to state, as a matter of expert knowledge, what would have happened to the Anderson car and the Eggert car if the conditions were as claimed by appellant as stated in the hypothetical question. They were also asked to answer a hypothetical question which embodied the facts as claimed by Eggert. In reaching their conclusion they applied their expert knowledge of the laws of physics. They were not asked,

and they did not undertake to say, where the collision took place. Whether the testimony was properly received in this case depends upon whether the members of the jury having that knowledge and general experience common to every member of the community would be aided in a consideration of the issues by the testimony offered and received. That the expert witnesses had knowledge of the results of the application of force under varying circumstances not possessed by an ordinary person seems self-evident. While the witnesses may not have experimented with colliding automobiles, they were possessed of special knowledge of the laws of physics and the behavior of bodies to which force is applied under given conditions. Just as a lay person may not be able to make a proper diagnosis although all the symptoms are present and within his knowledge that are within the knowledge of the physician, so a person without special knowledge may not know how movable bodies will operate under a given set of circumstances. It is considered that the trial court was not in error in permitting the expert witnesses to testify. Its instructions were well calculated to prevent the jury from attaching undue weight to the testimony of the experts. The court instructed the jury as follows:

"You are further instructed that the weight to be given to expert testimony is a question to be determined by the jury, and there is no rule of law which required them to surrender their own judgment, or to give a controlling influence to the opinion of expert witnesses. The jury is at liberty to exercise an independent judgment. In other words, the testimony of experts is not necessarily controlling on the jury. The jury may consider it along with other testimony and arrive at their independent judgment on the facts even though it would be in conflict with the opinion of the experts."

If the trial court was in error, as he supposed, in permitting the testimony of the experts to be received, it could only be because the matters as to which they testified were matters

that were within the common knowledge of mankind, that is, matters about which the jurors were as competent to judge as were the experts. If that were true then it must follow that the reception of the evidence was not prejudicial.

By sec. 274.37, Stats., no judgment is to be reversed for the improper admission of evidence unless in the opinion of this court it shall appear that the admission has affected the substantial rights of the party complaining. Speaking of testimony of this class Mr. Wigmore says (1 Wigmore, Evidence (2d ed.), p. 959, § 557):

"There is a rule of evidence which excludes, on the ground of superfluity, testimony which speaks to the jury on matters for which all the materials for judgment are already before the jury. This testimony is excluded simply because, being useless, it involves an unnecessary consumption of time and a cumbersome addition to the mass of testimony. In the majority of instances, the testimony thus excluded will consist of an 'opinion' by the witness, *i. e.,* a judgment or inference from other facts, as premises, and it will be excluded because the other facts are already or may be brought sufficiently before the tribunal. If they are not or cannot be, then the witness' judgment or inference will be listened to. Thus, it will often depend on the special qualifications of the witness whether he can add anything valuable which the jury have not already for themselves."

This is a case where it lay within the sound discretion of the trial court to admit or reject expert opinion. Under the facts of this case there was no abuse of discretion in permitting the expert witnesses to testify.

The second ground upon which the trial court set aside the verdict was that it was contrary to the clear preponderance of the credible evidence. The court said:

"I am, and have been since the close of the evidence, of the opinion that the preponderance of the evidence tends to the conclusion that Alfred Eggert was not wholly at fault. . . . I deem it unnecessary to dwell on it further than to say that the only evidence tending to show negligence on the part of Eggert which I can call to mind was of an inconclusive

nature, based upon speculation and possibilities, except the evidence of A. O. Anderson, who, of course, was vitally interested in the result of the suit. I refer to the testimony of witnesses who did not arrive at the scene of the accident until after the wrecker had been driven over the scene and the cars had been moved, and after several persons had walked around picking up glass, using a shovel and otherwise trying to clear the road of debris, after traffic had been passing for a day or two, and after a light snow had fallen."

We have given the evidence in this case full and careful consideration and are unable to concur in the opinion of the trial court. It is the opinion of this court that the great weight and clear preponderance of the evidence supports the verdict. The material facts briefly stated are as follows: We have already stated the direction in which the cars were traveling and the position of the various occupants. After the collision it appears without dispute that the Anderson car was near the bank of snow on the east or his right side of the road. The front wheel had been shoved against the bank. There is a dispute as to the location of the rear end of the Anderson car, but it was at the most not more than two and one-half feet away from the bank. According to Anderson when the cars collided the Eggert car rotated to its right or to the south, anticlockwise. The evidence practically without dispute is that it came to rest facing the west, the west end being a little to the south, and that it was about even with the south end of the Anderson car, which was on the east side of the road. After the accident Anderson could not move as his leg was pinned in between the side of the car and the brake lever so that he could not move his foot but he could see out of his west or left window. The first person to move was Eggert, who got out on the left side of his car, looked at his wife, and in response to a call from Mrs. Litzen, went around the rear of the car and opened the right door. At the time Dr. Litzen was leaning against the door and fell out, his head resting on the roadway and his feet on

the running board or in the car. Because of the injuries which he had received, Eggert was unable to prevent the fall or to assist him. Mrs. Litzen got out of the car and the two started to go to the Volland farm about a half mile to the north for help. Apparently Mrs. Litzen fainted away, at any rate, she laid down in the road for some time, but when Eggert returned she accompanied him back to the scene of the accident. The first persons to arrive after the accident were George Funk and his wife and his son-in-law, James Smith, and his wife. They approached the scene of the accident from the south. He noticed Dr. Litzen's bleeding, and testified that the pool of blood was about two feet on the west side of the center of the black-top, although measurements made later show that was east of the center of the highway. Stanley Brown, the traffic officer, arrived before the cars were taken away, made observations and measurements, and testified that the pool of blood was a little east of the center of the highway. Apparently the first thing that was done was to swing the rear or east end of the Eggert car to the south so as to make room for passing traffic. That movement had been made before Brown arrived. The radiator in the Eggert car was punctured and the radiator fluid escaped leaving a mark in the snow. Smith testified that he saw the spot of radiator fluid which was one and one-half feet in diameter, and was on the west side of the center of the highway and a little north of the Eggert car after the Eggert car had been swung. Brown made a measurement and found that the radiator-fluid spot was ten feet five inches from the west portion of the west edge of the highway using its full width,—twenty-four feet eight inches. There is other testimony to the same effect, but there seems to be no substantial dispute as to the location of the spot of radiator fluid. Eggert testified that when he first saw the Anderson car it was at his extreme right, that is, entirely on the west side of the highway. Photographs of the cars taken after the accident show that the front end of the Eggert car, including

both lamps, was badly damaged and crushed. See plaintiff Anderson's Exhibit O, herewith reproduced. The photo-

Exhibit O.

graph of the Anderson car shows that it received the heaviest part of the blow from the collision at the front edge of the door just back of the front wheel. See plaintiff Anderson's Exhibit Q. The question arises at once if Eggert's testi-

Exhibit Q.

mony is true, how could the cars have been found where they indisputably were after the accident? Plaintiff Anderson's Exhibit V is a photograph of the scene of the accident taken

Exhibit V.

on the afternoon of December 19th, looking south. The two crosses at the left of the photograph indicate the position of the right wheels of the Anderson car after the accident. The figure 2 indicates the area in which amber pieces of glass were found; 3 indicates the spot of blood; 4 the center of the highway, and 5 where the radiator-fluid spot is.

The evidence shows that the Anderson car was pushed a couple of feet or so to the east. When Dr. Litzen fell out of the Eggert car and his head rested on the highway it was east of the center line of the highway which would mean that the right door of the two-door Plymouth must have been at or east of the center of the highway. This is corroborated by the location of the radiator-fluid spot. No explanation is offered in briefs of counsel or elsewhere of the strange results of this collision if it happened as Eggert claims it did. He claims that the rear of his car rotated to the south or

clockwise. It is undisputed that Eggert was traveling from thirty-five to forty miles an hour and Anderson at a speed of about twenty miles per hour. Taking the physical facts as testified to by Eggert, his car was stopped except that it was swung around by the collision, that is, it did not go any farther south, at least not more than the width of the car. It is not claimed by anyone except Eggert that the Anderson car moved after it was hit, and the physical facts demonstrate that Eggert's testimony was in error. The trial court's statement that the testimony supporting the verdict was testimony of witnesses who did not arrive at the scene of the accident until after the wrecker had been moved and after traffic had been passing for a day or two and the debris had been cleared up, is not supported. As already stated Smith and Funk and their wives came upon the scene of the accident apparently before Eggert returned from Volland's. Brown, the traffic officer, arrived about 5 o'clock of the same day. Damerou, another traffic officer, arrived about 5:15 while both cars were still there. Georgen arrived about 2 o'clock on the afternoon of December 19th, testified that the weather was fine on the 18th and no snow had fallen up to the time of his visit since the accident, and took five photographs. Cyrus Koonz, who lives on the farm just south of the point of collision, was there within half an hour after the collision. Lee Putnam, hired hand on the Volland farm, was there before the cars had been taken away. William Sieber was an employee of the auto company which removed the cars, and was there on the evening of the 18th accompanied by one Gould. There were a number of witnesses who went to the scene of the accident on the 20th and the 21st. The evidence which they gave, however, was largely cumulative of that given by other witnesses who were earlier upon the scene.

The only evidence in the case which raises a question as to the conclusiveness of the physical facts which show that the accident occurred on the easterly side of the highway is that

given with reference to the tracks of the Anderson car. In regard to these Eggert testified as follows:

"I saw a tire mark, a small round knob tire. Starting from Mr. Anderson's left rear wheel the track ran in a southwesterly direction until my right side of the road where there was a skid of about two feet and then again proceeded in a southwesterly direction and then turned to directly south and followed down for, I would judge, one hundred feet."

It is undisputed that the rear wheels of Anderson's car had knobby tires. Eggert testified that the distance of that tire mark from the snowbank on the west side of the road would be two or three feet. Smith testified that the tire mark was west of the center of the road on the traveled portion of the west side of the road.

"My estimate would be about seven or eight feet. I traced that mark up to where it turned sharply and to where the car stopped. . . . I just glanced on the east side of the road south from where the cars were, but I never noticed anything."

Funk testified: "I walked one hundred fifty feet south from the crest of this hill to pick up what I called a tire track which was made by some tire similar to Anderson's. We turned around and went north to see how far we could follow it. We could follow it up to where it curved across the road. That must have been twenty feet south of the pool of blood. That was eight or ten feet from the crest of the hill where we saw those marks that looked like they went across the road. We couldn't trace those marks way across the black-top. The Eggert car came to a stop fifteen feet from that point. For a distance of fifteen feet from the Eggert car to the south, you could see absolutely nothing. That was because the road was bare black-top and frozen and we walked around there. We could see only one tire mark that made the curve."

Brown testified: "There was an odd tread tire mark on the west side of the highway. I could see this track and measured it down one hundred twenty-one feet down the west side of the highway. It was six feet five inches from the

west side of the road. After it got within a few feet of the Eggert car, it angled off toward the east where you could see. It was directly toward the northeast. I didn't see any tire marks on the east side of the road. I couldn't see any kind of tire marks in the center of that highway with the exception of one gouge, and I couldn't conclude as to who made that. I would say there were sixteen feet in that hard condition where you couldn't discover any kind of a tire mark."

Koonz testified: "At the foot of the hill, approximately seventy-five feet from where the accident took place, we could see tire tracks, knobby tracks, for a distance of about twenty feet. These were south of the accident at the foot of the hill, looking south. These tracks were detected about seventy-five feet from the scene of the accident. As we approached the incline the tracks were lost, until we got somewhat on the incline, and the track similar to the one we saw down the hill turned slightly to the east of the road about five or six feet. Then we lost that mark. Where we lost the mark was about twenty feet from the Anderson car. The outside tire track was within two feet and a half of the snow and gravel that had been pushed out by the grader. You could see where the Anderson car had traveled perhaps eighteen or twenty inches before it came to a rest—what I mean by traveled, is in a sideward position."

It is undisputed that Anderson had traveled south over this same piece of road about two hours previous to the accident with the same car. The testimony showed that it was a sunshiny day. With the exception of Eggert no one attempts to say that the tracks were continuous from the point where they began to the rear left wheel of the Anderson car. The evidence otherwise is to the effect that the road was icy, slippery, hard, and tire tracks with the exception of this knobby tire track could not be followed. If Anderson was on the westerly side of the highway and turned to his right, the evidence is conclusive that when the collision took place it occurred on the easterly side of the highway. Anyone traveling on the black-top, it being from eleven to fourteen

feet in width, would have to be practically on or over the center of the highway. The black-top was not wide enough to permit an automobile to travel on that part east or west of the center. This explains Anderson's turn to the right. Anderson testifies that he was turning to his right or to the east. Eggert and Mrs. Litzen so testified. Anderson testified he was on the east side making the turn. Mrs. Litzen and Eggert say he was on the west side. The Anderson car after the accident stood a little northeasterly. There are many other corroborating circumstances. Photographs were taken of the scene of the accident shortly thereafter, some on the 19th, some on the 20th and 21st, and they all indicate quite conclusively the location of the Anderson car at the time it came to rest. They of course do not show at what angle it stood because the car was gone, but the tracks so far as they indicate anything support the testimony of all the witnesses except Eggert and Mrs. Litzen.` Taking the Eggert and Litzen testimony out of the case, considering the condition of the cars after the collision, and all of the testimony, the evidence not only clearly preponderates in favor of the verdict but is conclusive in support of it. The jury quite evidently rejected the testimony of Eggert and Mrs. Litzen. It would seem that they were bound to do so if they fairly and impartially considered the whole evidence. It is considered therefore that the trial court was in error in holding that the verdict was against the clear preponderance of the evidence. There is no claim in this case that Eggert did anything or attempted to do anything because as he claims there was a car approaching him on his side of the highway. He saw the whole car and instantly there was a collision. He makes no claim he turned to the right or to the left. He put on no brake whatever. The Anderson car was struck at the instant he saw it. If he had maintained a lookout he could have seen the Anderson car when it was two hundred fifty

feet distant. As has already been said, there is no compromise possible in this case.

In our consideration of the case we have not attached great weight to the testimony with reference to the presence of glass upon the highway because of its indefinite character. At the best it is merely corroborative. There is evidence which tends to show that there was a considerable amount of glass on the east side of the highway, which came from the fog lights on the Eggert car broken in the collision. While it was evidence proper to go to the jury, it is so inconclusive as to leave the whole matter open to difference of opinion. Therefore we have not thought it necessary to extend the record in order to include a detailed statement of facts in regard to it.

In its opinion the court said:

"I have reluctantly reached the conclusion that a new trial must be granted in each of these actions for the reason that the court erred in the admission of evidence, for the reason that the verdict is contrary to the preponderance of the evidence, and for the further reason that it is in the interest of justice."

The third ground set out in the formal order granting a new trial is: "A new trial must be granted in the interest of justice." It is hardly necessary to say again that an order granting a new trial in the interest of justice is highly discretionary.

In *Van Valkenburgh v. Hoskins* (1859), 7 Wis. *496, *499, the court said:

"The circuit courts have an undoubted right, and it is their duty, to grant new trials where the verdict of a jury is manifestly against the weight of testimony and the clear justice of the case. In passing upon applications for new trials the law requires the circuit court to exercise an enlightened judgment and sound legal discretion. When this is done this court will not interfere, as we have repeatedly decided."

"In the interest of justice" as grounds for a motion for a new trial upon the minutes of the court, was introduced into our statutes by ch. 286, Laws of 1925. It is doubtful, however, if the statute did more than confirm the long-established practice of the court. See *Loehr v. Dickson* (1913), 151 Wis. 469, 138 N. W. 61, 138 N. W. 1128, 139 N. W. 407; *Schlag v. Chicago, M. & St. P. R. Co.* (1913) 152 Wis. 165, 139 N. W. 756.

This court has always reviewed on appeal motions for a new trial. The rule is stated thus in *Stockhausen v. Oehler* (1926), 191 Wis. 403, 405, 211 N. W. 287:

"The fact that the trial judge granted a new trial 'on the ground that the interests of justice will thereby be promoted' 'does not preclude this court from examining the whole record and from reversing if such examination clearly leads to the conclusion that there was nothing upon which to base such expression. But it does inform this court of the fact that the trial judge is of the opinion that justice has not been done and that a new trial should be had. In such cases we do not reverse merely because, upon the record before us, we come to a different conclusion. It must clearly appear that there was an abuse of judicial discretion before we reverse.' *McCoy v. Terhorst*, 188 Wis. 512, 517, 205 N. W. 420."

In this case there was a full and exhaustive trial, a verdict returned by a fair and impartial jury, there was no prejudicial error in the admission of the testimony of the expert witnesses; the instructions were impartial and are not criticised by either side; the evidence preponderates very strongly if it is not conclusive in support of the verdict of the jury; every possible issue has been canvassed exhaustively, every objection that could be raised has been raised and disposed of adversely to the respondents.

The trial court in referring to complaints made with respect to the manner in which the attorneys for the plaintiff cross-examined the witnesses said:

"Counsel have complained of what they term 'the unwarranted vigor with which the integrity of most of the wit-

nesses testifying against Anderson was attacked.' A vigorous cross-examination is, in my opinion, a right which should never be denied to a party to a lawsuit. I observed no departure from decency or propriety in the cross-examination of witnesses in this action."

The only thing that remains is the feeling of the trial court that Eggert did not conduct himself properly upon the witness stand. The record of course does not reveal his demeanor on the witness stand, but his testimony is clear, direct, and consistent. That he does not recall the circumstances as they probably were is no proof that he is consciously misstating the facts. Automobile collisions begin, culminate, and subside in a very small space of time, not sufficient to enable any witness to note and remember all that happened in its proper sequence. According to the undisputed evidence it was less than a second after Eggert first saw the Anderson car that the collision occurred. No doubt there were knobby-tread tire tracks on the west side of the road made by the Anderson automobile. Anderson had gone south two hours before when he would normally have been traveling on the west side. It is equally evident that the tracks could not be followed across the hard frozen icy surface in the center of the highway. Except Eggert, the witnesses substantially agreed on that. There is no indication that any other testimony could be secured upon a new trial. Everything that was favorable to Eggert's side of the case was brought out. There are many circumstances that we have not mentioned, such as the presence of the Christmas trees, additional photographs of the indentations in the bank, testimony of corroborating witnesses which tends strongly to support the verdict of the jury. Whatever Mr. Eggert's demeanor might be upon the stand, upon another trial his testimony could not be more favorable to his contentions than that given at the present trial. He admits he did not see the Anderson car until immediately before the accident.

It is undisputed under the facts that the car could be seen at least two hundred fifty feet away, that is, when each car was approximately one hundred twenty-five feet from the scene of the accident. The evidence so overwhelmingly supports the verdict of the jury that it ought not to be set aside lightly and merely for the purpose of permitting Eggert to give his testimony before another jury. That is apparently all that could be accomplished by a new trial. We therefore conclude it was an abuse of discretion under the circumstances of this case for the trial court to set aside the verdict in the interest of justice. It is quite apparent that the trial court was much impressed by the supposed error in the admission of the testimony of the experts, and by the fact that he thought the evidence preponderated against the verdict, as to both of which he was in error. With those questions removed from the case there is nothing to suggest that the verdict should be set aside other than the demeanor of Eggert upon the witness stand, which is clearly too inconsequential under the evidence to warrant a new trial.

*By the Court.*—The order appealed from in each case is reversed, and cause remanded with directions to the trial court to enter judgment upon the verdict as rendered.