BUBLITZ, Appellant, v. LINDSTROM and another, Respondents.

*October 3—October 30, 1962.*

For the appellant there was a brief by *Eisenberg & Kletzke,* attorneys, and *Edwin A. Star* of counsel, all of Milwaukee, and oral argument by *Mr. Sydney M. Eisenberg* and *Mr. Star.*

For the respondents there was a brief by *Arnold, Murray & O'Neill* of Milwaukee, and oral argument by *James T. Murray.*

FAIRCHILD, J.   Mrs. Bublitz testified that the collision occurred while her car was stopped at a traffic light.   Upon impact, she flew forward and the steering wheel hit her in the stomach.   Then she flew back and her neck snapped.   She went to a phone booth to call the owner of the car, and was later taken by ambulance to the emergency hospital.   She did not know whether she was conscious at all times.   She was given medication at the hospital and went home, although advised to stay.   She saw Dr. Verdone two days later, and continued to see him until January, 1959.   She did not see a physician from then until the time of trial, August 16, 1961.

Dr. Verdone testified that he found a whiplash injury to the neck with pain radiating down to the shoulder and the upper part of the back and chest, spasms of the muscles of the back and side of the neck, limitation of motion, numbness of both hands and arms, complaint of pain behind the ears and pulling sensation in the ears, complaints of headaches, dizziness, and severe abdominal pain.   She was directed to use a cervical collar to reduce pressure on nerves.

At subsequent visits, Mrs. Bublitz complained of menstrual irregularity for three or four months.

Dr. Verdone was of the opinion that Mrs. Bublitz had a cerebral concussion at the time of the collision.

Except for the matter of concussion, there did not seem to be a serious dispute as to occurrence of an injury and resulting pain and discomfort during at least part of the time she went to Dr. Verdone.   The conflicts between the parties were as follows: (1) If Mrs. Bublitz indeed had pain and other discomfort up to the time of trial, did it result from the collision? (2) Did the plaintiff prove any impairment of earning capacity? (3) Did the collision cause the hearing loss from which she suffered at the time of trial?

*Continued pain and suffering.* Mrs. Bublitz testified that she still had headaches, pains in her neck, occasional attacks of pain in her stomach, pains under her shoulder blades, and at the top of her spine.

Dr. Verdone acknowledged that 90 to 95 percent of the patients with cervical disc syndromes improve rather well, and endeavored to explain why Mrs. Bublitz did not. All the doctors agreed that Mrs. Bublitz had a congenital abnormality in that there is a fusion between the second and third cervical vertebrae. The normal intervertebral space does not exist between these vertebrae. Near the front, however, the vertebrae do not impinge on each other, and a space exists between them. Dr. Verdone compared an X ray in 1957 with one taken in 1961, and considered that the space was narrower in 1961 than in 1957, although the defendants' experts disagreed with his interpretation of the X rays. In connection with his opinion that the space was narrower in 1961, he stated the following opinions: That the fusion process is not stationary, but progressive; that "the inflammatory process that occurred following the accident . . . resulted in a destruction of the intervertebral space;" that the narrowing space causes "a greater amount of pressure to be exerted against the spinal nerve;" and this is "a permanent feature of this patient."

Dr. Sadoff, on the other hand, examined Mrs. Bublitz at the request of defendants in 1959 and at the time of trial, concluded, for reasons which he stated, "Whatever complaints, or injury she had sustained at the time of the accident in 1957, she has made a complete recovery."

*Impairment of earning capacity.* Mrs. Bublitz and her former husband had been professional roller skaters, performing as a team, and appearing in theaters, hotels, nightclubs, and several movies. This activity began when Mrs. Bublitz was fifteen and continued until about 1950, when

she was twenty-seven. She was thirty-four at the time of the collision. In 1950 her husband was injured and they stopped skating. They were divorced in 1953 or 1954. Mrs. Bublitz, who had been working as a waitress or restaurant manager, testified that she "was very ill mentally" and "very depressed" after the divorce, and that she stopped working and went on public relief. She testified that after a period of time she made plans to return to professional skating, first by herself and later to form a team with a Mr. Luczyk, a skater without previous professional experience.

She testified that prior to the accident she had contacted Mr. Clifford Burmek, a theatrical producer in Milwaukee; that he was willing to book her; and that she had been offered $100 per week at the start. Mr. Burmek, however, testified that he could not recall being contacted by her in 1955 or 1956 with respect to securing employment; that he had not had occasion to find employment for more than three roller-skating acts since 1957, each for a one-night engagement; and that in Milwaukee a team would get $50 for one appearance. He testified that there had never been a professional act with one person roller-skating that he knew of; that, "Roller-skating teams, like in every other field, whether it's a singer, or whether it's a musician, whether it's a dancer, or whether it's a comedian, are evaluated by their individual ability. The scope of their earnings is not limited to any given amount. . . . basically a roller-skating act can get $25, $50, or they can get $150 or $350, depending on their equipment and their ability. There again it's ability and equipment that determines, and national reputation determines the amount of salary." He also indicated that in recent years there has not been much interest in roller-skating acts.

We conclude that from the evidence one could only guess what earning capacity Mrs. Bublitz may have had as a pro-

fessional roller skater just before the accident, or would have had since 1957 if she had not been injured.

Mrs. Bublitz testified that she had earned $59.60 per week as a manager of a restaurant. She said that after the collision she was unable to do any housework for a period of time although for some period prior to trial she had been able to do it except for moving furniture and other heavy work. If she had an earning capacity of $60 per week, she could have earned about $14,300 from the time of the collision until the trial. The jury award was almost 70 percent of that amount. There was no testimony of any attempt to work nor that her hearing loss would render her unemployable although that is possible. In any consideration of whether the award was sustained by the evidence, it is obvious that the extent of her hearing loss and the issue of whether the collision caused it would be highly significant.

*Hearing loss.* Mrs. Bublitz testified that her hearing became impaired shortly after the accident, although that complaint was not reflected in the reports Dr. Verdone gave to her attorneys at that time. During a recess in the trial she had a single audiometric test made by a registered nurse in the office of an eye, ear, nose, and throat specialist. The nurse testified that according to the American Medical Association rating, Mrs. Bublitz had 100 percent hearing loss in the left ear and 60 percent hearing loss in the right ear.

Dr. Verdone stated the following opinions: "At the time of the original accident she had a cerebral concussion. . . ." ". . . she had an injury that was sufficient in its severity to produce damage to the auditory apparatus." "That there was a direct causal relationship between the loss of hearing and the injury . . ." The left ear is worse than the right "because of the contrecoup type of effect where striking one side of the head will produce damage to the other side of the brain." "That she has a permanent loss of hearing."

Dr. Muskat, an ear, nose, and throat specialist, called by defendants, testified that during recesses in the trial he examined Mrs. Bublitz and made several different tests. On the basis of irregularity in some of her answers, he did not think she was completely co-operative, but he found a mixed conduction and nerve deafness in both ears, more marked on the left. Dr. Muskat attributed her hearing loss to pathology of the middle ear, not caused by trauma.

*Defendants' surprise with respect to hearing loss.* The complaint and amended complaint served in January and August, 1959, did not allege specifically that Mrs. Bublitz suffered hearing loss. Mrs. Bublitz was examined as an adverse party February 3, 1959. She did mention her hearing in two instances. One was that when she had first gone to Dr. Verdone she had discomfort back of her ears. She had knots come up back of her ears and she could not hear too well; she felt as if she were in a high altitude. On the other occasion she testified that at the time of the adverse examination her only complaints were for her stomach, her neck, and her headaches, and that when she had headaches in the back of her head it affected her hearing. The transcript of the adverse does not indicate any difficulty in her hearing counsel's questions. She did not ask him to repeat, nor did her answers appear unresponsive.

Dr. Verdone sent a report to Mrs. Bublitz's original attorney on April 11, 1957, and this report made no reference to loss of hearing. In early 1959 Dr. Verdone sent a report to the attorney who represented Mrs. Bublitz when the action was started. He made no reference to loss of hearing.

Dr. Sadoff examined Mrs. Bublitz at the request of defendants in March, 1959. She made no complaint to him concerning her hearing. He did not examine her ears because hearing would be outside his field of specialization, but she responded to his questions.

The record indicates that there was at least one pretrial conference, as well as an attempt at conciliation. Although it would be improper to consider the amounts of proposed settlement for almost any other purpose, the question here is whether defense counsel was surprised by evidence of hearing loss at the trial. The figures shown in the record make it most improbable that there could have been any discussion of hearing loss as a result of the collision. Mrs. Bublitz changed counsel the day before trial, and Dr. Verdone testified that he never told any attorney about a claim of hearing loss until the time of trial.

Counsel for defendants objected to testimony concerning hearing loss on the first occasion a question was asked on that subject, pointing out that neither the complaint nor any of the medical reports mentioned any loss of hearing. The circumstances amply demonstrate that counsel was in fact surprised at the claim that Mrs. Bublitz suffered a hearing loss and that defendants were responsible for it.

When the objection was made, the court evidently concluded that defendants' rights would be protected by an opportunity to have a doctor examine Mrs. Bublitz during recesses of the trial. In retrospect the court concluded otherwise, and ordered a new trial in the interest of justice.

Defendants were not entitled to the exclusion of the evidence of hearing loss as a matter of right. The complaint alleged that plaintiff—

". . . has suffered great damage in that she, in the manner aforesaid, sustained injuries to parts of her body, and more particularly to her neck and back. The injuries sustained were as follows: Cerebral concussion; contusion to the right parietal area of the skull; whiplash injury to neck; sprain of the thoracic cage; sprain of the abdominal muscles; menstrual irregularity; sprain of the back; sprain of both shoulders; generalized body contusions and abrasions and severe nervous shock."

Although the form of the allegation suggests that the injuries were being specifically listed, it does not seem that impairment of hearing is so unrelated to cerebral concussion and contusion to the right parietal area of the skull as to be excluded from the claim as a matter of law.[1]

The issue presented, however, is whether there was an abuse of discretion in ordering a new trial under all the circumstances. "It is hardly necessary to say again that an order granting a new trial in the interest of justice is highly discretionary."[2]

Whether or not this court would say that there was evidence in the record to support a finding that Mrs. Bublitz's present complaints were caused by the collision and would be permanent, or a finding that her hearing loss was caused by the collision and would be permanent, it is clear that the learned circuit judge who saw and heard the witnesses did not think so. Obviously the issue of hearing loss was crucial in terms of the size of the amount which could properly be awarded. Although defendants were able to obtain an ear specialist to examine Mrs. Bublitz and testify as to his opinion concerning the cause of her hearing loss, they necessarily had little chance to make other types of investigation of this portion of her claim. They undoubtedly would have done so had the demands on them before trial been predicated upon impairment of hearing. There was testimony suggesting that she was unco-operative in determining the truth as to the extent of the impairment.

---

[1] For authority that injury not specifically mentioned may be proved under an indefinite and general allegation where there has been no motion to make definite and certain, see 2 Callaghan's, Bryant, Wisconsin Pleading and Practice (3d ed.), pp. 368, 369, sec. 20.20; *Holmes v. Fond du Lac* (1877), 42 Wis. 282, 286; *Delie v. Chicago & N. W. R. Co.* (1881), 51 Wis. 400, 401, 8 N. W. 265; and *Curran v. A. H. Stange Co.* (1898), 98 Wis. 598, 608, 74 N. W. 377.

[2] *Anderson v. Eggert* (1940), 234 Wis. 348, 371, 291 N. W. 365.

We are of the opinion that there was no abuse of discretion in ordering a new trial at which the issues as to hearing loss can be litigated after defendants have had a full opportunity to prepare to meet them.

We do not pass upon the sufficiency of the evidence to support the amounts awarded by the jury nor upon the judge's finding that the awards were so excessive as to establish perversity, passion, and prejudice on the part of the jury. It should be observed that if it be established that a hearing loss of the extent claimed by plaintiff resulted from the collision, a very substantial award would be warranted.

The issues in this particular case are not limited to whether the evidence in the record supports the jury awards. The circuit court declined to apply the rule of *Powers v. Allstate Ins. Co.*[3] and give plaintiff an option of a new trial or judgment for an amount fixed by the court as a fair and reasonable award under the evidence. We do not consider this a proper case for granting such option.

*By the Court.*—Order affirmed.

[3] (1960); 10 Wis. (2d) 78, 102 N. W. (2d) 393.