UPTON, by Guardian *ad litem,* and another, Plaintiffs and Respondents, v. TATRO, Defendant: RURAL MUTUAL INSURANCE COMPANY, Defendant and Appellant.

*No. 368. Submitted under sec. (Rule) 251.54 February 5, 1975.—Decided June 3, 1975.*
(Also reported in 229 N. W. 2d 691.)

For the appellant the cause was submitted on the brief of *Terwilliger, Wakeen, Piehler, Conway & Rouse, S. C.* of Wausau, attorneys, and *Douglas J. Klingberg* and *Thomas N. Akey* of Wausau, of counsel; and for the plaintiff-respondents the cause was submitted on the brief of *Schmitt, Nolan & Hansen* of Merrill.

DAY, J. The principal question on this appeal is the same as that raised in the case of *Nordahl v. Peterson,* ante, p. 538, 229 N. W. 2d 682. Is consent by the title-holder and named insured to operate a motor vehicle implied where such consent is given by one who, for all practical purposes, is the owner of the vehicle and has such permission from the named insured? The question involves the interpretation of the omnibus coverage

clause, sec. 204.30 (3), Stats.[1] We hold that under the facts in this case such consent must be implied as a matter of law.

The second question is whether or not there is credible evidence to support the jury finding that the insured's son, who is also the insured's permittee, gave permission to the driver of the car at the time of the accident to operate the vehicle in question. We find that there is such credible evidence to support the jury's verdict.

In February, 1969, Mr. William Ahlers purchased a 1963 Corvair automobile in Wausau, had the legal title put in his name, and took out insurance with himself named as the insured. The money to purchase the car, however, was supplied by his son Harold for whose exclusive use the car was obtained. After the purchase, Mr. William Ahlers returned to his home in the town of Deerbrook, near Antigo, and Harold kept the Corvair with him in Wausau where he was living and working. The senior Mr. Ahlers testified that "for all practical purposes" the car belonged to Harold. At the time of the purchase, William Ahlers instructed his son to drive

[1] "204.30 Accident insurance and highway traffic policy provisions. . . .

"(3) COVERAGE. No such policy shall be issued or delivered in this state to the owner of a motor vehicle, unless it contains a provision substantially as follows: The indemnity provided by this policy is extended to apply, in the same manner and under the same provisions as it is applicable to the named assured, to any person while riding in or operating any automobile described in this policy when such automobile is being used for purposes and in the manner described in the policy. Such indemnity shall also extend to any person legally responsible for the operation of such automobile. The insurance hereby afforded shall not apply unless the riding, use or operation is with the permission of the assured named in this policy, or if such assured is an individual, with the permission of an adult member of such assured's household other than a chauffeur or domestic servant, such permission in both cases to be deemed permission without regard to s. 343.45 (2) or to whether the riding, use or operation is authorized by law; . . ."

safely and told him he was not to allow anyone else to drive the car without Mr. William Ahler's consent. These instructions were repeated every time Harold came home for a weekend. Harold also testified that such instructions were given and had been given on the very weekend that the accident which gives rise to this action occurred. William Ahlers testified that he was unaware of anyone, other than his son Harold, ever driving the Corvair and Harold testified that he once allowed a friend to drive the car to the store when he and the friend were living in Wausau, but said his father was not aware of this until after the accident involved in this case.

On August 10, 1969, Harold Ahlers drove the defendant Patrick Tatro and one Peter Larson, both high school friends, out to another friend's house (one Jerry Walters), who lived outside of Antigo in Langlade county. Harold was driving the Corvair. There they met Jerry Walters and another friend, Mr. Brandt. There were then five young men at the Walters' home and there were at least two cars at the house, including Harold's. The young men fixed themselves a meal and drank beer. At about 2 o'clock in the afternoon, Harold called a girl whom he had been dating, Patricia Elam (now Boodry), to ask her to join them. She was contacted at the home of her cousin, Judy Upton. She stated that Judy did not want to come, but that she would try to talk her into it. Thirty to forty-five minutes later Harold called back but was advised that the situation was the same as far as the girls were concerned and, according to Patricia Boodry, Harold said he would call back later. Harold did not call back, but Jerry Walters called and this time Patricia said they would come out to his house; Jerry advised her that he would find someone to come and get them. Harold testified he thought he remembered talking with Patricia on the phone but does not believe he made the arrangements for her to come out to the Walters' residence.

Patrick Tatro took Harold Ahlers' car into town to pick up the girls. The girls went with Mr. Tatro and it was on the return trip that the accident occurred in which Judy Upton was injured and which gives rise to this lawsuit.

The first question to be answered is, did Mr. Tatro have Harold Ahlers' permission to go into Antigo to pick up Harold's friend?

An affidavit of Mr. Tatro's taken by the counsel for plaintiffs-respondents was admitted into evidence and states that:

"After Patricia agreed to come out, Harold, I and some of the other fellows out there discussed who would go in to get the girls. Harold had been drinking that afternoon and did not want to drive into town. We finally decided that I would go, and that I would use Harold's car. We just discussed the matter among ourselves and reached the concensus that I would go with the Corvair. Harold knew I was going to use his car, but he did not give me express permission to do so, nor did he expressly forbid me from using it."

At the time of the trial, Mr. Tatro was out of the state as a member of the air force. Portions of a deposition taken of him on March 15, 1972, were read into the record at trial. The deposition contradicted parts of the affidavit; in the deposition he stated he was not sure if Harold was present when the discussion was held as to who would go into town to pick up the girls. He said that Harold may have been in another room watching television. He stated there was a decision "more or less" that he would be the one to go and get the girls, but it was a decision resulting from the fact that everyone else refused to go and he was the only one left to make the trip. He testified in the deposition that Harold had been drinking and did not want to drive into town. On this issue, Harold admits to having had five or six beers. In the deposition, Mr. Tatro denied there was a decision as

to which vehicle he would take to get the girls; he said that was left "more or less up in the air." At the deposition he said he took Harold's car because it was the most convenient; it was nearest the back door. He stated that Harold neither expressly permitted nor expressly forbade him to take his car. When asked whether Harold knew he was going to pick up the girls, Mr. Tatro replied, "He probably did, but the way he became knowledgeable of it was probably when I drove out the driveway or something like that." At the deposition Tatro was directly confronted with his affidavit made only a little over a week earlier and said:

"Well, as it was boiled down, he would have known, had he looked out the window or possibly saw me go outside. This statement, it's hard to tell, I really don't know. I can't peek into his mind, but I believe he probably knew I was going, but I can't be certain. . . . The location of the car was in pretty much plain view of the room we were in. It was right outside of the window, and, yes, I believe he probably knew I was using it, his car."

He also testified at the deposition he believed he had driven the Corvair once before, returning from a dance hall or tavern with Harold when Harold had had too much to drink.

Harold admitted it was probably his idea to get Patricia out to the Walters' house and that he took part in some talks about who would get the girls, as he wanted Patricia to be there. Harold testified that he was asked if he wanted to go into town to get the girls but that he declined and does not remember anyone saying they were going. He testified he doubted it was decided that Tatro would go and supposed Tatro did go because no one else would. He testified that he did not give Tatro his permission to take the Corvair and would not have done so if asked because he knew Tatro did not have a driver's license but only a temporary permit. A police officer testified that Mr. Tatro did not have a driver's license at

the time of the accident. Harold did testify that he did leave the keys in the ignition of his car. He said he did not see Tatro leave with his automobile.

Myron Upton (Judy Upton's father) testified he overheard a conversation between Harold, Mr. Tatro and two others at the hospital the evening of the accident. Mr. Tatro said to Harold, "Let's go outside. We got to get our stories straight." The two then went outside for about five to seven minutes. At the trial, Harold testified he did not recall any such conversation.

None of the other boys at the Walters' home had ever dated either of the two girls. Patricia testified that when Mr. Tatro arrived to pick them up he told them that Harold told him to come and pick them up. The objection of Rural Mutual to this testimony will be discussed later. The trial on the issue of insurance was had before a jury on May 25, 1973, and the judgment for the plaintiffs-respondents Judith Upton, by her guardian *ad litem* Leonard F. Schmitt, and Myron Upton, finding permissive use of the automobile and coverage under the policy was entered July 11, 1973. Rural Mutual appeals from that judgment.

As to the question of whether Mr. Tatro had Harold's permission to drive the automobile, Rural Mutual did move for a directed verdict, partially on the basis of the alleged insufficiency of the evidence to prove permission from Harold to Mr. Tatro; however, their motion, at the time of motions after verdict, was for judgment on the verdict dismissing the complaint against it since the jury had answered "No" to the question of whether or not Mr. Tatro had the permission of the father, William Ahlers, to drive the automobile. In its memorandum decision the trial court ruled that the policy covered use by Mr. Tatro at the time in question as a matter of law. It is from this judgment that the insurance company appeals.

Rural Mutual now tries to raise for the first time after verdict the issue of the jury's finding on the special ver-

dict that Mr. Tatro had Harold's permission to use the car. The plaintiffs-respondents contend this question is not properly before this court because the insurance company made no motion to change the answer on this question to "No" and for a judgment on the verdict as so changed. Nor did it move for a new trial. The only motion after verdict made by the insurance company was for judgment based on the jury's answer to the second question of the special verdict as to the senior Mr. Ahlers' lack of permission to Mr. Tatro. The plaintiffs-respondents made four alternative motions after verdict. The trial court found that as a matter of law William Ahlers' consent to drive was given to Mr. Tatro and changed the answer in the special verdict accordingly; the plaintiffs-respondents had so moved.

The law of this state is that:

". . . no error of the court should be reviewable *as a matter of right* on appeal without first moving in the trial court for a new trial bottomed on such error, . . ." *Wells v. Dairyland Mut. Ins. Co.* (1957), 274 Wis. 505, 518, 80 N. W. 2d 380.

Because Rural Mutual did not raise below the claimed error, it is not entitled as a matter of right to have the question reviewed here. Were we to review it, based on the record before us, we would find against the insurance company. The proper standard to apply was set out in *Bergmann v. Insurance Co. of North America* (1970), 49 Wis. 2d 85, 87, 88, 181 N. W. 2d 348:

". . . if there is any credible evidence which under any reasonable view fairly admits of inferences which support the jury's verdict, the verdict must be sustained, and neither the trial court nor this court may tamper with it. . . . The evidence must be considered in the light most favorable to the jury verdict. . . . Furthermore, the trial judge and this court are only to consider the evidence which supports the jury's verdict. . . . The evidence supporting the verdict must be accepted by the

court unless it appears that the evidence is patently incredible."

If there is credible evidence to support the jury verdict, it does not matter that it is contradicted or that the contradictory evidence is stronger and more convincing. *Lutzenberger v. Milwaukee Electric Railway & Light Co.* (1937), 224 Wis. 44, 48, 271 N. W. 409. Furthermore, the above "is particularly true when the verdict has the blessing of the trial court . . . ." *Delaney v. Prudential Ins. Co.* (1966), 29 Wis. 2d 345, 349, 139 N. W. 2d 48.

Considering only that evidence most favorable to the plaintiffs and in the light most favorable to them, there was credible evidence to show that five young men were having a party at the home of one of them; that no one but Harold had ever dated either of the two girls; that Harold had been dating Patricia for some months, wanted her to come to the party and phoned her twice to persuade her to come out; that she finally consented when talking with another boy; that Harold had been drinking in the afternoon and did not want to drive to town to pick up the girls. Mr. Tatro was his friend, whom he had brought to the party and who may have driven Harold's Corvair once before; that Harold left the car in a very convenient spot in the driveway and left his keys in the ignition and that Harold knew that Tatro had no car at the party; that the affidavit which Mr. Tatro had initially given said that all of the boys, including Harold, had made a decision that he would go and pick up Harold's girl friend and return them to the party. The defendants did not object to the receipt of that affidavit into evidence and the jury had a right to consider that alongside a deposition of Mr. Tatro which later contradicted portions of that affidavit; that was a question for the jury as to which version of Mr. Tatro's they chose to believe. The unfavorable portion of Mr. Tatro's testimony, as far as the plaintiffs were con-

cerned, was impeached by Patricia Boodry who testified that when Mr. Tatro picked them up he said that Harold had told him to get them.

Harold admits that he never expressly forbade Mr. Tatro to take his car. Harold never told the police officer who investigated the accident that Tatro had no permission to use the car. We conclude that there is credible evidence in the record from which the jury could find that there was implied consent from Harold to Mr. Tatro to use the car to get the girls. This court has held that the requisite permission need not be expressed but that it may be implied from all the circumstances and the question is one of fact for the jury. *Christiansen v. Aetna Casualty & Surety Co.* (1931), 204 Wis. 323, 236 N. W. 109; *Bushman v. Tomek* (1936), 222 Wis. 562, 269 N. W. 289.

The second paragraph in the special verdict read, in part:

"Did William Ahlers give permission, either express or implied, to his son, Harold Ahlers, to allow Patrick Tatro to use this vehicle on the day of the accident in question?"

The jury answered this question "No." In motions after verdict, plaintiffs moved to have the answer changed to "Yes;" the motion was granted and judgment on the issue of coverage was entered in favor of the plaintiffs.

The insurance policy in question was issued to Harold's father who was the titleholder of the automobile and the policy bound Rural Mutual to pay on behalf of the insured all sums which the insured became legally obligated to pay as damages because of bodily injury. The policy defined "insured" as:

". . . the named insured and, if the named insured is an individual, . . . any person while using the automobile with the permission of an adult member of the named insured's household other than a chauffeur or domestic servant, and any person . . . legally responsible for such use by such person."

In its memorandum decision, the trial court found:

"In the case in question, the father was the named insured, and his name appeared on the vehicle's title as a matter of convenience. The son, Harold Ahlers, was the true owner of the vehicle in every sense of the word, including the fact that he paid for the vehicle and had the vehicle in his exclusive control and possession while a resident of another city. Although he would journey home for periodic visits, he continued to use the vehicle as his own vehicle during these visits. The issue raised by the fact situation in the instant case is whether the restriction of the father who is listed as the owner of the vehicle for convenience only is a valid restriction on the use of that vehicle to the son who is the true owner of the vehicle. . . .

". . . In Wisconsin, it is clear that the true owner of the vehicle has the right to impose restrictions upon the use of that vehicle. The question before this court concerns a fact situation in which the parent is not the true owner of the vehicle but the titleholder for convenience only. In resolving this issue, it is appropriate to consider the broad policy considerations of insurance. It is clearly a valid public policy that members of the public be protected from injury by uninsured motorists wherever possible. The insurance company, in issuing the policy on the vehicle in question, did not bargain for the type of restriction placed upon the vehicle's use by the named insured. It is clear that were no restrictions placed, there would be policy coverage. Therefore, the risk of the insurance company was not expanded by a finding that the restrictions placed by the father are not effective since the son is the true owner."

In the case of *Nordahl v. Peterson, supra*, this court has held that where the minor is the true owner of the automobile and title and insurance are held in the name of the adult as a matter of convenience or economy, whether or not the adult has forbidden the minor to allow others to drive the minor's vehicle is immaterial and the permission of the named insured is implied as a matter of law. In *Nordahl* we quoted the language in *Krebsbach v. Miller* (1963), 22 Wis. 2d 171, 177, 125 N. W. 2d 408:

"Also, where for all practical purposes the first permittee is the real owner of the car but title has been taken in the name of the named insured for reasons of convenience, the general control and custody of the first permittee is such that, when he grants permission to a third person to operate the insured vehicle, such operation is held to be with the implied permission of the named insured."

We have specifically withdrawn the implication in *Foote v. Douglas County* (1966), 29 Wis. 2d 602, 139 N. W. 2d 628, which quoted this language from *Krebsbach* with approval but stated that whether there was permission from the titleholder and named insured to the actual minor-owner for permission to let others use the car was an issue of fact for the jury.

We hold that under the fact situtation in this case where, for all practical purposes, the first permittee, Harold Ahlers, is the real owner of the car, exercising ownership control over the vehicle and where title to the car and insurance has been taken in the name of the father as a matter of convenience or economy, when the son loaned the vehicle to another the father's consent is presumed as a matter of law. We therefore conclude that the trial court did not commit error in changing the special verdict question from "No" to "Yes" on the issue of permission from the named insured.

This court said in *Pavelski v. Roginski* (1957), 1 Wis. 2d 345, 351, 84 N. W. 2d 84:

"We conclude that the legislature *did* intend the omnibus coverage clause for the benefit of persons injured and that it should be construed to effect that purpose."

The defendant-appellant objects to the trial court's admission into evidence of Patricia Boodry's testimony that when Mr. Tatro picked up Judy Upton and her cousin that he told her that Harold told him to come and get them. The objection is not well taken. This was plainly

hearsay testimony but its admission was not error because it was not admitted for its truth but only for impeachment purposes, and the trial court so instructed the jury immediately upon receiving it.

On appeal, Rural Mutual now raises objection to some of the trial court's instructions. The record shows that there was some express dissatisfaction by the defendant at the trial court but no formal objection was ever registered. Failure to object amounts to waiver. *Savina v. Wisconsin Gas Co.* (1967), 36 Wis. 2d 694, 154 N. W. 2d 237. There were no motions after verdict alleging error of instructions; there was no motion for a new trial on any ground and errors if there were any are therefore waived. *Wells v. Dairyland Mut. Ins. Co., supra,* at page 518.

*By the Court.*—Judgment affirmed.