NORDAHL and wife, Respondents, v. PETERSON, Defendant: STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Appellant.

*No. 443. Argued February 4, 1975.—Decided June 3, 1975.*
(Also reported in 229 N. W. 2d 682.)

For the appellant there was a brief by *L. E. Sheehan* and *Moen, Sheehan & Meyer, Ltd.*, all of La Crosse, and oral argument by *L. E. Sheehan*.

For the respondents there was a brief by *LaVern G. Kostner* and *Fugina, Kostner, Ward, Kostner & Galstad*, all of Arcadia, and oral argument by *LaVern G. Kostner*.

DAY, J.  The principal question on this appeal is whether the consent of the titleholder and named insured to operate the motor vehicle is implied as a matter of law where the permission to operate the vehicle is from the minor permittee of said titleholder and named insured, when the minor permittee is for all practical purposes the real owner of the vehicle and exercises ownership control over such vehicle. The question involves the interpretation of the omnibus coverage clause, sec. 204.30 (3), Stats.[1]  Other questions raised on appeal will be discussed in the opinion.

[1] "204.30 **Accident insurance and highway traffic policy provisions.** . . .

"(3) COVERAGE. No such policy shall be issued or delivered in this state to the owner of a motor vehicle, unless it contains a provision substantially as follows: The indemnity provided by this

This is a wrongful death action by the parents of a minor who was killed when the car in which he was a passenger crashed into a bridge. The parents brought this action against the driver of the automobile and the insurer of the record titleholder of the vehicle. Judgment was entered on a verdict in favor of the plaintiff parents James and Arlene Nordahl and against the defendant Brian Peterson, the driver of the vehicle, and the titleholder's insurer, State Farm Mutual Automobile Insurance Company (State Farm). From this judgment, State Farm appeals.

The trial court found that the vehicle in question was, for all practical purposes, owned by Randall Van Dinter, a minor. He lived with his parents Gilbert and Shirley Van Dinter near Black River Falls. The family owned two cars. On May 24, 1972, Randall became seventeen years of age and his father took him to look at a 1966 Ford automobile. He told Randall that if Randall wanted the automobile, he would buy it for him. Two days later on May 26, 1972, Randall and his mother concluded the purchase of the vehicle. Randall testified that the car was "more or less" a birthday present to him, but that his father reserved the right to use it for hunting and fishing so that he would not have to take one of the other family cars into the woods. The parents agreed

policy is extended to apply, in the same manner and under the same provisions as it is applicable to the named assured, to any person while riding in or operating any automobile described in this policy when such automobile is being used for purposes and in the manner described in the policy. Such indemnity shall also extend to any person legally responsible for the operation of such automobile. The insurance hereby afforded shall not apply unless the riding, use or operation is with the permission of the assured named in this policy, or if such assured is an individual, with the permission of an adult member of such assured's household other than a chauffeur or domestic servant, such permission in both cases to be deemed permission without regard to s. 343.45 (2) or to whether the riding, use or operation is authorized by law; . . ."

with this assessment of the transaction and Mr. Gilbert Van Dinter testified that it was a birthday present given with the understanding that he could take it and use it when he wanted to. The purchase price was paid by Gilbert Van Dinter and was not to be repaid by Randall. The insurance was paid for by Gilbert Van Dinter with the understanding that Randall was to repay his father for the premium. The title to the automobile was put in Gilbert Van Dinter's name for the reason that Randall was a minor and because the premium would be cheaper if the father took title and insurance in his own name.

During the course of the trial, counsel for State Farm attempted to introduce testimony that the parents had explicitly forbidden Randall to allow anyone else to drive any of the family cars, including the one purchased for him. Such evidence was objected to as immaterial and the objection was sustained. In the absence of the jury, an offer of proof was made by State Farm. Mrs. Van Dinter testified that her son had been instructed not to allow others to drive any of their family cars and that to her knowledge he had never done so. Gilbert Van Dinter testified that he had frequently told Randall never to let others drive the family cars and specifically told Randall on his birthday that he was never to let anyone else drive the car that was to be purchased for him. Mr. Gilbert Van Dinter testified that he had no knowledge that Randall had ever let anyone drive one of the family cars. Randall testified that he was told that he was not to let anyone drive the car purchased for him or any of the family cars. Randall also testified before the jury that he had never allowed anyone else to drive one of the family cars. The court, after hearing the offer of proof, sustained the objection to the admission of the testimony.

After the purchase of the car was concluded on May 26, 1972, Randall took the car to school, gave some friends rides home after school and then went with

Brian Peterson, the driver at the time of the fatal accident, to the Van Dinter home to pick up some clothing, as Randall was planning to spend the night at Brian's house. They went to Brian's home and later went to Black River Falls to pick up some friends and then went to Hixton in Jackson county to a dance at a dance hall there. They arrived about 8 o'clock in the evening. During this period Randall did all of the driving. He testified that he had never been to this particular dance hall before and that he had not observed any policemen in the area. Brian, on the other hand, and another friend who was there that night, said there was always a policeman circulating around the parking lot to prevent the young people from drinking beer. Randall testified he did not notice anything about the lighting in the parking lot but Brian said it was well-lighted. This testimony was important because of the implications it raised as to whether Brian Peterson would have been inclined to stay in the parking lot and drink beer in Randall's car. When they arrived at the dance hall, Randall parked the car in the lot and about 9 p.m., Randall, Brian, and another person left the dance, drove into Hixton and bought a 12-pack of beer and returned to the dance without drinking any of it. Brian testified that on their return they parked under a bright overhead light in the parking lot of the dance hall.

Randall and Brian and some others left the dance hall together about 10 p.m. They drove two or three miles away, parked on the side of the seldom-used road, and drank some of the beer. They returned about 10:45 or 11 p.m. and parked in the same place in the lot under the light. Randall up to then had done all the driving. He testified that on each occasion when arriving at the dance hall parking lot he always locked the door and called out loud for someone to lock the other doors. Brian testified that he recalled Randall saying to lock the car when they had it at the school much earlier in

the day but he testified that on none of the occasions of parking at the dance hall did he lock his door or hear anything from Randall about locking the doors. After being at the dance hall for a while on their latest return, Brian met a classmate and friend of his and Randall's, the deceased, Charles Nordahl. This was about 11:15 p.m. Brian and Charles talked for a while and then Charles asked Brian if he wanted to leave and inquired how he had gotten there. Brian testified that this was in the context of wanting to go out to have some beer. Brian then saw Randall near the entrance of the dance hall and asked Randall if he could have the keys to the car. The music was very loud but Brian testified that Randall said something to the effect of "be careful" and that nothing explicit was said about driving the car but that Randall handed the keys over to Brian without hesitation. At a prior deposition, Brian denied hearing "be careful" from Randall and on cross-examination he admitted being unsure about that statement. At the deposition, Brian said he got the keys because he figured the car was locked and he intended only to sit in it. However, when confronted with that on cross-examination he testified that was "Not really" so, that such was not his only intention; he thought of driving the car before Charles Nordahl later suggested it in the car, despite his assertion to the contrary at the deposition. Brian said that nothing was said explicitly between him and Randall about driving the car but stated "There was no reason that we would just sit in the car, we couldn't drink the beer there." Brian also testified that he had never driven a Van Dinter automobile before.

Randall's testimony is at variance with that of Brian. Randall testified that when Brian asked for the keys he inquired as to the purpose and that Brian had stated he wanted only to sit in the car. A short time later Randall testified that he did not know why Brian wanted the keys but assumed the car was locked. He said he did

not know Brian wanted to have a beer but admits he said nothing explicit to Brian about not driving the car and he put no express condition on the use of the keys. When Brian got the keys he went to Randall's car and Charles Nordahl was already sitting in it and the driver's door was unlocked. Within a short period of time, two girls walked by and Charles asked them if they wanted to go for a ride and they agreed. Brian started the car and they drove away. They drank no beer in the parking lot.

Randall testified at this point he had finished the one dance he wanted to dance when Brian was asking him for the keys and that he was walking out of the dance hall entrance when he saw his car leaving the parking lot. He ran after the car, motioning and calling for Brian to return. This behavior was confirmed by another friend who was at the scene at the time. Shortly thereafter an ambulance went by on the highway in the same direction as Brian had driven Randall's car. After that Randall seemed upset, according to a friend, and told him that he had not given Brian permission to take his car.

Eventually Randall found a ride out to the scene of the accident. Brian had been driving and Charles Nordahl was killed in the accident. Two girls in the back seat were also injured. When Randall arrived, he went up to Brian and said, "Why did you do it, why did you do it?" Randall testified he meant, "Why did you take off with my car?" Brian did not believe that this was what Randall meant.

The police officer directing the investigation at the scene said that Randall told them that night he had given his keys to Brian, but that Randall never claimed that Brian had no right to be driving the automobile. One of the girl passengers in the car testified that she talked to Randall later at school about the accident and he told her that he had given Brian the keys but did not

say that he had told Brian not to drive the car. Randall testified that he never told Brian before or since the accident that he had no right to drive the automobile.

The policy, written by State Farm and issued to Gilbert Van Dinter, the titleholder of the automobile, states that the company agrees "to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of (A) bodily injury sustained by other persons . . . caused by accident arising out of the ownership, maintenance or use . . . of the owned motor vehicle . . . ." The policy contains a definition of the term "insured" as follows:

> **"Definitions . . .**
> "Insured—The unqualified word 'insured' includes (1) the named insured, and . . . (4) any other person while using the owned motor vehicle, provided the operation and the actual use of such vehicle are with the permission of the named insured, such spouse or an adult member of the household other than a chauffeur or domestic servant, and are within the scope of such permission. . . ."

The first question is, is there credible evidence in the record to support the jury finding that Brian had Randall's permission to drive the automobile?

Permission to drive an automobile may be either express or implied from the totality of the surrounding circumstances, but such implied consent:

> ". . . depends on the state of mind of the permitter, but it may be proved by circumstantial evidence. In effect, implied permission is but actual permission circumstantially proven." *Derusha v. Iowa National Mut. Ins. Co.* (1970), 49 Wis. 2d 220, 223, 181 N. W. 2d 481.

This court has also said, "Mere presumption that permission had been given or would be given if asked is not sufficient." *Locke v. General Accident Fire & Life Assurance Corp.* (1938), 227 Wis. 489, 494, 279 N. W. 55.

From the evidence produced at the trial, we conclude there was credible evidence to support the jury finding of an implied consent from Randall to Brian to drive Randall's car.

In connection with the issue of the permission of Randall to Brian to drive the car, the defendants claim that it was prejudicial error to admit into evidence a written statement made by Brian Peterson to the police that Randall had "loaned" him the automobile. An officer with the Jackson county sheriff's department determined at the scene that Brian was the driver of the automobile and after advising him of his rights, he asked Brian to fill out a traffic statement describing in Brian's own words how the accident occurred. Brian sat in the officer's squad car at the scene of the accident, wrote his statement on the sheriff's department traffic form. A copy of that statement was identified by the officer at the trial and introduced as evidence. Counsel for State Farm objected at trial to the admission of a portion of the statement which reads: ". . . and Randall Van Dinter loaned us his car . . . ." Counsel's objection was that the language used constituted a self-serving conclusion of law, that it invaded the province of the jury and was a conclusion on one of the ultimate-fact issues to be determined by the jury.

We find no error in the admission of this statement. It was taken at the scene of the accident soon after the accident occurred. It is in the handwriting of the driver and purports to be a statement of what he believed the facts to be. The maker of the statement was a party to the action, codefendant, although his interests were adverse to the objecting codefendant, the insurance company, on this issue. However, he was available for cross-examination on this issue as on the other issues raised by his testimony. The use of the word "loaned" by Brian in the traffic report was not inconsistent with

other testimony given by him and was merely another fact along with the other facts on this issue to be weighed by the jury in reaching their conclusion as to whether or not such permission had in fact been given.

The insurer in this case does not challenge the conclusion of the trial court that Randall was the real owner of the car for all practical purposes but relies on the terms of its policy that permission had not been given to Brian to drive the car by the named insured, Gilbert Van Dinter, and that it was error requiring reversal for the trial court to exclude the proffered proof of such nonpermission and the explicit directions to his son Randall not to permit anyone else to drive the automobile. Similar testimony of Mrs. Van Dinter and of Randall Van Dinter was likewise excluded as being immaterial.

The court relied on this court's statement in the case of *Krebsbach v. Miller* (1963), 22 Wis. 2d 171, 177, 125 N. W. 2d 408, wherein this court said:

"Also, where for all practical purposes the first permittee is the real owner of the car but title. has been taken in the name of the named insured for reasons of convenience, the general control and custody of the first permittee is such that, when he grants permission to a third person to operate the insured vehicle, such operation is held to be with the implied permission of the named insured."

The fact situation envisioned in the quotation goes beyond the facts in the *Krebsbach Case*. There the record showed that the father owned only one car and several months after purchase permitted his son to take the car to Milwaukee for a period of several months because the son had a job there. While in Milwaukee the son loaned the car to a friend to run an errand and the friend was involved in an accident. This court said at page 178:

"In the instant case the named insured turned possession of the insured car over to his son to take it 130

miles distant and there use it for a period extending over several months. The majority of this court conclude that under such circumstances, absent an express prohibition against permitting others to drive the car, such circumstances will require a finding that the named insured gave defendant Alfred Miller implied permission to operate the car at the time and place of the instant accident. The only reasonable inference to be drawn from such circumstances is that the son was to exercise the same control over the use made of the car that an owner would."

In the *Krebsbach Case* the son was not "for all practical purposes . . . the real owner of the car." The situation of the borrowed car with the first permittee exercising the same control that an owner would exercise is of a different character than the situation where the first permittee is in fact the "real owner" of the vehicle.

The language quoted above from *Krebsbach* regarding implied permission to the real owner of the car by the named insured to permit third parties to drive was specifically approved in the case of *Foote v. Douglas County* (1966), 29 Wis. 2d 602, 606, 139 N. W. 2d 628. In *Foote,* the mother had purchased a car for the use of her daughter, the daughter had given permission to a third party to drive and an accident occurred resulting in injuries to the plaintiff. Both the mother and the daughter had initially given statements to the insurance company investigator stating that the mother had denied permission to the daughter to allow anyone else to drive the car. These statements were specifically repudiated by both the mother and daughter at trial and this court stated:

". . . Under oath they categorically denied that there was in fact a prohibition on Marla's [daughter] letting other persons drive. Indeed, Mrs. Rydberg testified that she had observed others driving the car 'a dozen or more times.'

"The Rydbergs also explained that the car was registered in the mother's name but that the real owner was Marla and that it was purchased for Marla's use."

Mrs. Rydberg testified that Marla reimbursed her for the purchase price and for the insurance premiums and that title and insurance were taken in her name for economy reasons, but that the car was used exclusively by Marla and was in effect Marla's automobile.

Because of the conflicting statements earlier made as to permission, the question of permission from the mother to the daughter for third parties to drive had been submitted to the jury and this court stated at page 607, "We believe that this was an issue of fact for the jury and that there is credible evidence to support its finding." The finding was that the mother had in fact given permission to the daughter to permit others to drive. To the extent that that statement implies that the true owner, who exercises control over the vehicle consistent with such ownership, must have the permission of a titleholder and named insured, who is such only as a matter of convenience or economy, before such true owner can grant permission to others to drive his vehicle, it is withdrawn.

We agree with the reasoning of the Montana Supreme Court in the case of *Cascade Ins. Co. v. Glacier General Ins. Co.* (1971), 156 Mont. 236, 244, 479 Pac. 2d 259. In that case the registered owner and named insured obtained a car for the use of her son while he was away from home at college. He was listed as the principal user and a higher premium rate was paid. Both the mother and her son testified that he was told by his mother not to loan out the car while he was at college. The son did, however, and the second permittee was involved in an accident. The Montana court went on to say:

"In the instant case our facts reveal a contract of insurance, drawn by the insurance company, the terms of which are so fluid that it vests the insured with the authority to determine who shall be the beneficiary of the contract. It requires no notice or that any other condition be met. It can be extended to any number of persons at any time without any advance in price or consideration. . . .

"Under our fact situation, it is highly questionable that there was an intention by the insured to deny insurance benefits as opposed to the protection and conservation of a valued asset at the time the instructions were given not to loan the automobile, any more than it could be reasonably assumed that the insured would intend to withhold benefits from the first permittee [son], if he were prohibited the use of the automobile for 30 days for disciplinary purposes and this prohibition was violated and an accident occurred.

"The use to which the first permittee put the automobile in a loan to a college friend with whom the first permittee was to share an apartment was a reasonably foreseeable use to be anticipated by the insured. Considering the family relationship between the insured and the first permittee, together with the unfettered dominion over the automobile away from home, this insured clothed the first permittee with the ostensible authority to engage in the simple transaction of permitting a friend to use the automobile."

To the same effect that admonition not to loan to others given to the first permittee by the parent is really for the purpose of protecting the asset rather than to deny coverage. *See: Standard Accident Ins. Co. v. Allstate Ins. Co.* (1962), 72 N. J. Super. 402, 410, 178 Atl. 2d 358.

This court also said in *Krebsbach,* page 176, ". . . we must ever keep in mind that this court is committed to a broad, rather than narrow, construction of the word 'permission' as it appears in the policy omnibus coverage clause required by sec. 204.30 (3), Stats."

Parents frequently buy cars for their children to go to school, to jobs, and for social and recreational uses,

and such children are for all practical purposes the real owners of the cars. The parents hold record title and insurance in their own names as a mere matter of convenience or economy. It would defeat the main purpose of the omnibus clause statute, which is to help assure coverage for accident victims, to hold that the real owner can be denied permission to loan his vehicle to another. One of the indicias of ownership is the right to loan one's property for the use of another. The real owner of an automobile is no exception. By the terms of the policy, the named insured may grant permission to his permittee to let others drive the insured vehicle. In other cases that permission will be implied from surrounding circumstances *(Krebsbach,* and cases therein cited). We hold that under the fact situation in this case, where for all practical purposes the first permittee, Randall Van Dinter (a minor), is the real owner of the car, exercising an owner's control over the vehicle, and where title to the car and insurance has been taken in the name of the father as a matter of convenience or economy, when the son loaned the vehicle to another the father's consent is presumed as a matter of law. Therefore, the ruling of the trial court that the proffered testimony of the Van Dinters as set forth in the offer of proof to the effect that Randall had been told not to let others drive his automobile was immaterial and the trial court properly excluded it from the consideration of the jury.

Under the rule enunciated by this court in *Powers v. Allstate Ins. Co.* (1960), 10 Wis. 2d 78, 102 N. W. 2d 393, the trial court found the jury award of $17,500 in pecuniary damages, while not a result of error, prejudice or perversity, was excessive. The trial court ordered that such damages should be reduced to $12,000 and the plaintiff was given the option of accepting said sum or having a new trial on the issue of damages. The plaintiff elected to accept that amount and remit the

difference. The defendant State Farm appeals from the trial court's action, contending the reduced damages are still excessive.

State Farm agrees that the sum of $8,158.50 in pecuniary damages due to the death of Charles Nordahl is proper for the parents to recover. This is based on the fact that the deceased was the only son on the farm and his father had no nonfamily assistance. After Charles Nordahl's death, his father had to reduce the size of his dairy herd significantly; he reduced the acreage he was farming from 480 to 280 acres; and his production fell off accordingly. The defendant thus acknowledges that a figure within $4,000 of that which the trial court awarded is correct. However, the defendant does not consider what impact Charles Nordahl may have had upon his parents' pecuniary well-being in the future, particularly after reaching the age of majority, had Charles lived. The testimony was uncontradicted that Charles Nordahl was a very large young man, six feet four inches, weighing 190 pounds, a hard worker, and very interested in making farming his career. A neighbor farmer testified that Charles had been doing a man's work since he was twelve years old and that he always paid Charles more than most farm hands because he could do more work than many men over Charles' age. His teachers testified that Charles was very interested in being a farmer, that he had taken every agricultural course that was offered in high school and was very active in extra-curricular agricultural activities and was president of the 4–H Club. Charles did two hours of chores every morning before school and two more hours in the afternoon when he returned home. He worked on the farm during all his vacations and sometimes stayed home from school to help with the work. He could run all the equipment on the farm since he was fourteen years of age. He had given up football in his sophomore year to be free to do more

work on the farm. He had won a certificate in herd testing and several contests in agricultural technology. Charles had spoken to his father several times about his plans for the future. He planned to take a two-year college course in agriculture at a nearby college so that he could return home on weekends to help with the farmwork. He expressed a desire to return to the farm after his schooling, where he would work the farm with his parents, taking an interest in the farm under some kind of profit-sharing arrangement with the idea that some day the farm would be his. The jury was specifically instructed to consider what pecuniary benefits the parents may have received from Charles after he reached the age of majority and the trial court considered such benefits in making its ruling, although he indicated that such would be very difficult to calculate.

Considering the evidence in the light most favorable to the plaintiffs, an award of less than $4,000 for pecuniary loss to the parents for the benefits they would have received after their son returned from school is not excessive. The amount the trial court apparently allotted for this area of pecuniary loss is well within the range of reasonably debatable amounts and the trial court did not abuse its discretion in fixing the total where it did. *Boodry v. Byrne* (1964), 22 Wis. 2d 585, 126 N. W. 2d 503. This court has held that there is no presumption in favor of parents receiving pecuniary benefit from children after their arrival at majority and that to support a verdict for such damages, evidence must be introduced. While evidence of this nature cannot be very direct or conclusive, it should be such as the circumstances of the case will permit. *Ptak v. Kuetemeyer* (1924), 182 Wis. 357, 368, 369, 196 N. W. 855, 197 N. W. 363; *see also: Wing v. Deppe* (1955), 269 Wis. 633, 637, 70 N. W. 2d 6; *Prunty v. Schwantes* (1968), 40 Wis. 2d 418, 426, 162 N. W. 2d 34; *see generally,* Adrian Schoone, *Expanding and Limiting*

*Damages for Pecuniary Injury Due to Wrongful Death,*
45 Wis. Bar Bulletin 45, 52–54 (August, 1972). The
evidence introduced here was sufficient to support the
award as fixed by the court.

*By the Court.*—Judgment affirmed.