MEURER, and others, Plaintiffs-Appellants, v. ITT GENERAL CONTROLS, and others, Defendants-Respondents.

Supreme Court

*No. 76–561. Argued May 30, 1979.—Decided June 29, 1979.*
(Also reported in 280 N.W.2d 156.)

For the appellants there was a brief by *Donald C. Fellows* and *Kenney, Krembs, Fellows & Wolfe,* and oral argument by *Donald C. Fellows,* all of Milwaukee; and by *James G. Forester* and *Forester, Carroll & Rupke* and oral argument by *James G. Forester,* all of Brookfield.

For Annetsberger Bros., Inc., there was a brief by *Walter L. Merten* and *Merten, Connell & Sisolak, S.C.,* and oral argument by *Paul E. Schwemer,* all of Milwaukee.

For Ranco, Inc., there was a brief by *Robert D. Sullivan* and *Riordan, Crivello, Sullivan & Carlson,* and oral argument by *Robert D. Sullivan,* all of Milwaukee.

For ITT General Controls there was oral argument by *Dale N. Miracle* of Wauwatosa.

CONNOR T. HANSEN, J. Robert W. Meurer, vicepresident and partner in the bakery and realty companies, and Ronald Couturier, supervisor of the plain-

tiffs' carry-out business, had installed the new Annetsberger deep fryer several days before the fire. They had installed such equipment before and did not look for any installation or operating instructions.

The fryer was installed adjacent to two broasters in a tiled cooking area which was covered by an exhaust hood with a fan which had been in use about a year. The fryer was filled with shortening and Meurer and Couturier both agreed that the fryer worked fine when they tested it. The fryer temperature control was set at 350° and the timer was set for three minutes. Employees were instructed not to change these settings. All employees were instructed on the fryer's operation. The fryer was turned on each morning about 11 a.m. by means of a toggle switch on the front panel. After the oil had reached 350°, as indicated by a light on the front panel, the basket would be filled with french fries and a button would be pushed that raised and lowered the basket automatically. Employees were also told to turn the fryer off if the oil became smoky or wavy. However, employees were not told how to turn the fryer off using either the gas valve or circuit breaker.

Couturier was in charge of maintaining the cooking equipment. He filtered and changed the oil when necessary and cleaned and changed the hood filters. This maintenance was done on a regular schedule and the equipment, walls and floors were cleaned by the employees each day. Couturier said the employees had complained of heating problems with the original fryer but that there had not been any complaints about the new fryer.

Meurer said the building had been constructed about a year previously and that the cooking area was included in the original plans. Both he and Couturier agreed that there were no fire extinguishers in the building, and that employees had not been given any instructions as to what action to take in case of a fire.

A fire started in the area of the fryer at about 5:45 p.m. Rosina Stefan, a bakery clerk working at the store the evening of the fire, testified that she first noticed a brightness in the cooking area as she was working at an adjacent counter. When she turned she saw flames coming from the fryer and going up into the hood. The other employee asked for a fire extinguisher and Rosina replied that she hadn't seen one. She said they left the building when the flames reached a decorative wood fence above the hood.

She said the fryer had been used to make one or two orders earlier that evening but that there had not been any customers for five or ten minutes before the fire and the fryer wasn't being used then. She did not know how long the fire had been burning when she saw it, and she did not see any smoke or smell anything unusual before noticing the fire. It was her opinion that the employees kept the cooking area pretty clean.

She further testified she had heard complaints about the fryer but admitted that she did not know a new unit had been installed. She had not been given any instructions on what to do in the case of such a fire and she said that she supposed she would have tried to use a fire extinguisher if there had been one but that she did not know if she could have extinguished the fire. She said she wouldn't have gotten as close as necessary to turn off the fan or fryer.

Diane Musinsky, the other employee present at the time of the fire, testified that she did not notice the fire until Rosina Stefan yelled to her. She then saw smoke and flames on top of the grease in the fryer as well as on the wall and the top of the fryer. She said the flames were two or three feet high at first and did not reach the hood which was four feet above the fryer. She ran to adjoining stores looking for a fire extinguisher and failing that she ran to the back of the store looking for the circuit breakers, which she also

could not find. This took one or two minutes. She had used the fryer that evening without any problems and did not remember making an earlier statement that first shift employees had told her that there had been a problem with smoke and that someone had come in to check the fryer.

Karl P. Schuh, the fire department battalion chief who responded to the fire, said that this was an ordinary restaurant fire with the heaviest charring above the deep fryer. He listed the cause of the fire as grease igniting at the unit. He testified that a flash fire can occur in an exhaust hood if there is an accumulation of grease and vapors with a heat buildup of 400° to 500°, and said he was unable to tell whether this fire originated in the fryer or the hood. He said that he considered fire extinguishers a must in a restaurant with a deep fryer, that a dry chemical extinguisher was recommended for extinguishing a grease fire and that many restaurants had this type of extinguisher. This type of extinguisher would have put this fire out even if the fire were fed by gas. He said he was assuming that someone would be trained to use the extinguisher but that they were very easy to use.

Phillip Stollenwerk, the city of Milwaukee building inspector assigned to plaintiffs' store, testified he conducted fire prevention inspections three times a year. The store was not in violation of any code provisions and the store was not required to have a fire extinguisher, sprinkler system or fire protective hood system because its cooking area was under 500 square feet. This testimony was confirmed by George Kuetemeyer, a supervisor in the city building inspector's department.

Several expert witnesses were called by the respective parties. Three separate components were discussed: the thermostat, manufactured by Ranco, which controlled the heat at which the oil was held; the high-limit control, also manufactured by Ranco, which prevented the

oil from heating over 475°; and the ITT gas valve which provided gas to both the pilot light and the burner which heated the oil. As might be expected, their methods of testing the components varied and the conclusions they reached as to the cause of the fire were in conflict. Their testimony will be further considered in our discussion of the issues, which are:

1. Did the trial court abuse its discretion in refusing to submit a special verdict question on the cause of the fire?

2. Did the trial court abuse its discretion in the instruction it gave on the plaintiffs' duty to protect their property?

3. Is there credible evidence to support the verdict?

4. Did the trial court err in allowing Annetsberger's expert to testify and in restricting plaintiffs' cross-examination of this expert?

### SPECIAL VERDICT.

The special verdict questions inquired as to whether the defective components or the negligence of the plaintiffs was the cause of the fire damage. All parties submitted requested special verdict questions and the trial court, in the exercise of its discretion, concluded that based upon the evidence presented a special verdict question requiring the jury to determine the cause of the fire would be inappropriate. The trial court concluded that a question as to the cause of the fire would create a potential for improper comparison because, as the trial court stated, "the end question" is not the cause of the fire but the cause of the fire damage.

A special verdict must cover material issues of ultimate fact. Sec. 805.12, Stats. The form of a special verdict is discretionary with the trial court and this court will not interfere as long as all material issues

of fact are covered by appropriate questions. *Sheldon v. Singer,* 61 Wis.2d 443, 453, 213 N.W.2d 5 (1973). Where a party might be found negligent in several respects a single question as to that party's negligence is permissible. *Fink v. Reitz,* 28 Wis.2d 319, 324, 137 N.W.2d 21 (1965) ; *Henrikson v. Maryland Casualty Co.,* 3 Wis.2d 379, 387, 388, 88 N.W.2d 729 (1958). In *Schrank v. Allstate Ins. Co.,* 50 Wis.2d 247, 260, 184 N.W.2d 127 (1971), the court held a question directed to the cause of the injury rather than the cause of the accident was proper if there was "some proof of causation separate and distinct from the impact itself."

In the instant case the jury found that none of the defendants' products were defective and therefore never reached the corresponding cause questions. The questions inquiring as to the conduct of the plaintiffs read:

"QUESTION NO. 7.
"Were the plaintiffs Meurer negligent with respect to care and protection for the safety of their property?
"Answer: Yes.
"QUESTION NO. 8.
"If you answer Question No. 7 'yes,' then answer this question: Was such negligence of the plaintiffs Meurer a cause of the April 15, 1971 fire damage?
"Answer: Yes"

This is the proper form for a contributory negligence question. *Kull v. Sears, Roebuck & Co.,* 49 Wis.2d 1, 11, 12, 181 N.W.2d 393 (1970). The question includes the two ways in which the plaintiffs could have been considered negligent, either in the use and maintenance of the equipment, including the exhaust hood, or in failing to provide fire extinguishing devices and instructions to their employees. Obviously the failure to provide fire extinguishing devices and instructions could not relate to the cause of the fire. A question directed solely to the cause of the fire would defeat the purpose of the ultimate fact verdict and require an additional question

regarding the negligence of the plaintiffs. This could create confusion and the trial court did not abuse its discretion in failing to inquire directly regarding the cause of the fire.

## INSTRUCTIONS.

The instructions given by the trial court were necessarily lengthy because of the several issues presented and the number of parties involved in the litigation. Those concerning the contributory negligence of the plaintiffs are as follows:

"In connection with Question No. 7 you are instructed that the conduct of employees Ron Couturier, Rosina Stefan and Diane Musinsky and the conduct of Robert Meurer as well as omissions, if you find any such omissions, with respect to fire protection equipment, training in the use of such equipment or fire protection activities or deficiencies in the construction or maintenance of the premises, in the respects hereinafter referred to, is attributable to the plaintiffs Francis J. Meurer, Lorraine Meurer, Richard Meurer, Robert Meurer and Francis Meurer, Jr., who are partners doing business as Meurer Bakery and Meurer Realty. Thus this question inquires about the negligence of the Plaintiffs Meurer and all of the conduct referred to should be considered in answer to this question.

"I have already defined negligence for you as a failure to exercise ordinary care.

"Every person in all situations has a duty to exercise ordinary care for the safety of his property. This does not mean that he is required at all hazards to avoid injury to his property; he must, however, exercise ordinary care to take precautions to avoid injury to his property from fire.

"One must exercise ordinary care to employe his senses of sight and hearing so as to become aware of the existence of danger to him. A failure to do so is negligence.

"If you should find that the plaintiffs Meurer failed to follow directions and warnings as to the use of the deep fat fryer, then you will find the plaintiffs negligent in

this respect. If you are not so satisfied, you will not find the plaintiffs negligent in this respect.

"It is the duty of every person to exercise ordinary care to recognize and appreciate all defects and dangers that are open and obvious to him or which should have been recognized and appreciated by a reasonably prudent person under the same or similar circumstances. That duty includes the appreciation of danger of fire. Such a person has a duty to exercise ordinary care to provide for his own protection and safety such fire protection and extinguishing devices and equipment and such training of his employees in the use of fire prevention procedures and fire protection and extinguishing devices and to construct and maintain his premises to guard against the prospect of fire and the damage resulting therefrom as a reasonably prudent person would under the same or similar circumstances.

"You are further instructed that a person is not bound absolutely by law to see every defect or dangerous condition or even to remember the existence of every defect or dangerous condition of which he had knowledge. He is only required to act as a reasonably prudent person under the same or similar circumstances would act.

"You are further instructed that a person is not required to anticipate negligent acts or omissions on the part of others and is not guilty of negligence in failing to look out for danger when there is no reason to suspect any such danger."

Appellants' counsel objected to this instruction on the ground that it goes beyond ordinary care and overemphasizes the need for fire protection. The trial court explained that a reasonable standard of ordinary care is that parties protect against fire. He explained that the thrust of the cross-examination was the need for various fire protection devices; shut-off controls and training of employees.

Jury instructions are within the trial court's discretion:

"The trial court has discretion in instructing a jury as to matters of emphasis, choice of language, and detail

or brevity so long as it fully and fairly informs the jury of the rules and principles of law applicable to the particular case. . . ." *Webb v. Wisconsin Southern Gas Co.*, 27 Wis.2d 343, 350, 351, 134 N.W.2d 407 (1965).

". . . The instruction must be germane to the situation at hand and must be framed in the light of the evidentiary issues. . . ." *Carlson v. Drews of Hales Corners, Inc.*, 48 Wis.2d 408, 414, 180 N.W.2d 546 (1970).

This court has recognized that a failure to provide or use appropriate fire extinguishers could be considered negligence in *U. S. Fidelity & Guaranty v. Frantl Ind.*, 72 Wis.2d 478, 241 N.W.2d 421 (1976), and *Jacob Johnson F. Co. v. Wachsmuth L. Co.*, 143 Wis. 632, 128 N.W. 283 (1910). In *Arledge v. Scherer Freight Lines, Inc.*, 269 Wis. 142, 151, 68 N.W.2d 821 (1955), this court stated the following rule:

"The owner or occupant of a premises on which an accidental fire starts, through his act, is liable for damages resulting from his failure to use reasonable diligence to prevent it from spreading to other property after he is aware of the existence of the fire on his premises, even though the act which causes the start of the fire is not a negligent one, and his premises are in good condition. . . ."

Although the case does not involve contributory negligence it does hold that the owner has a duty to control the spread of a fire. The holding in *Arledge v. Scherer Freight Lines, Inc., supra,* is in accord with the general statement in 35 Am. Jur.2d, *Fires,* sec. 26, where it is stated that a party who carries on activities using fire to any great extent, or where danger of fire is frequently present, may be liabile for fire damage resulting from failure to provide fire extinguishers.

The instruction of the trial court reasonably sets forth the duties of the appellants. It is not repetitive and

fairly states the law as it relates to the evidence presented.

### SUFFICIENCY OF THE EVIDENCE.

The appellants also contend the verdict is contrary to the great weight and clear preponderance of the evidence. This contention is based upon their conclusion that the jury determined their negligence was the sole cause of the fire.

As the trial court correctly stated in its decision, the appellants draw the wrong conclusion from the verdict. The jury did not find the conduct of the appellants was the sole cause of the fire, rather it found the negligence of the appellants was a cause of the fire damage. The appellants had the burden of proving that the products of the defendants caused the fire. Obviously, they were unable to prove this to the satisfaction of the jury.

The standard of view of a jury verdict is that it will not be upset if there is any credible evidence to support it. The evidence will be viewed in the light most favorable to the verdict. *May v. Skelley Oil Co.*, 83 Wis.2d 30, 35, 264 N.W.2d 574 (1978) ; *Nelson v. Travelers Ins. Co.*, 80 Wis.2d 272, 282, 283, 259 N.W.2d 48 (1977). This is especially true where, as here, the verdict has the approval of the trial court. *Upton v. Tatro*, 68 Wis.2d 562, 570, 229 N.W.2d 691 (1975). The credibility of witnesses and the weight given to their testimony are left to the judgment of the jury, and where more than one reasonable inference can be drawn from the evidence, this court must accept the inference drawn by the jury. *Roach v. Keane*, 73 Wis.2d 524, 536, 243 N.W. 2d 508 (1976). On appeal the obligation of this court is to search for credible evidence that will sustain the

verdict, not for evidence to sustain a verdict the jury could have but did not reach. *Coryell v. Conn.*, 88 Wis.2d 310, 317, 276 N.W.2d 723 (1979).

One of the two employees who testified stated that she first noticed a brightness in the cooking area when she was working at a nearby counter. At this time the fire was in the fryer, on the wall and in the exhaust hood. She called it to the attention of the other employee. There was no fire extinguisher on the premises and neither of the employees had received any instructions as to what to do in case of a fire. All of the expert witnesses testified that overheated cooking oil emitted a pungent or acrid odor before it ignited. Some of them testified that ignition was also preceded by a dark smoke —neither of the employees smelled any odor or saw any black smoke, before the actual flames were first observed by Rosina Stefan.

As the appellants indicate in their brief, all experts rendered opinions against all other parties. The principal expert witness for the appellants was John P. Tendick, a consulting engineer. The trial court stated, in its decision on motions after verdict, the methods he used in conducting tests on the component parts could well have affected his credibility. Many of his tests were conducted in his garage using camping equipment, and we agree with the observation of the trial court.

The jury found the ITT valve was not in a defective condition and unreasonably dangerous. There was evidence that some ITT valves used in Annetsberger deep fryers were defective and were replaced by the company. There was also testimony that the valve in this particular unit was in a later series than the defective valves. It tested satisfactorily at the ITT laboratory. The unsatisfactory tests at Ranco occurred after a valve electrical connection had been broken and repaired. Although there was sufficient evidence so that the jury could have found this valve defective, the assessment and weight of

the credibility was within the province of the judgment of the jury.

The jury also found that the Ranco high-limit control was not defective or unreasonably dangerous. This control was tested and found satisfactory at Ranco. There was also testimony by Alfred E. Meyer, research and development engineer for Annetsberger, that these controls had proven to be highly dependable. Only appellants' expert, Tendick, testified that his tests of this high-limit control demonstrated problems with this component. As the trial court stated, his method of testing could well have affected his credibility in the judgment of the jury.

The jury also found the fryer itself was not in a defective condition and unreasonably dangerous. Since the jury concluded the components were not defective, there is little or no evidence upon which the jury could find the fryer itself was defective and unreasonably dangerous. The high-limit control was placed according to an accepted industry practice and the gas shut-off valves were accessible to employees.

Finally the jury found the plaintiffs' causally negligent as to the fire damage. There was testimony that the plaintiffs had not instructed the employees what to do in case of fire and had not provided fire extinguishers or other fire protection equipment. However, even if the jury concluded that the fire was accidental or that its origin had not been satisfactorily explained, there is still sufficient credible evidence to support a finding that the appellants were contributarily negligent. The verdict is supported by credible evidence.

## EXPERT TESTIMONY.

The appellants also contend the trial court erred in allowing Marvin A. Salzenstein, an expert witness called by Annetsberger, to testify.

A pretrial order entered October 13, 1975, ordered Annetsberger to give the appellants the names of its witnesses within 30 days and to provide appellants with written reports of their tests. Salzenstein was retained by Annetsberger on October 20, 1975, but appellants were not informed that he would testify until shortly before the trial, which commenced in October, 1976.

The appellants did not object when Salzenstein first commenced his testimony. However, when he began to testify as to various probable causes of the fire, the appellants entered an objection because Annetsberger had not complied with the pretrial order. The trial court thereupon conducted a hearing, out of the presence of the jury, which hearing is a matter of record.

At this hearing Annetsberger's counsel stated he had telephonically contacted both counsel for the Meurers and Fidelity & Casualty Company of New York, their insurer, prior to trial and both counsel had told him they would not object to witness Salzenstein. Counsel for Meurers stated that he had been contacted two weeks before trial in regard to witness Salzenstein and stated that he would not object to his testimony. Actually some of the equipment was made available for examination by Salzenstein. Counsel for the insurer stated he had been first contacted the Saturday before trial at which time he stated he would not object to the testimony of witness Salzenstein. The above stated facts do not appear in dispute. At oral argument, counsel for the insurer advanced other reasons for giving his consent; however, such reasons are not in the record.

The trial court found that counsel for both appellants had waived any objection to the calling of witness Salzenstein.

At this same hearing, counsel for ITT and Ranco stated they knew nothing about Salzenstein's testifying as a witness prior to trial. Thereupon, the trial court ruled that the testimony of Salzenstein could only be used for resisting the claim of the appellants against Annets-

berger and could not be used for the purpose of advancing the cross-complaint of Annetsberger against ITT or Ranco. Also during the trial the trial court restricted the cross-examination of Salzenstein by the appellants to the claim of the appellants against Annetsberger. In support of this ruling the trial court stated that if the appellants were permitted to cross-examine Salzenstein to support or assist in proving their claim against ITT or Ranco, they would be able to accomplish by indirection that which Annetsberger could not do.

In its decision on motions after verdict, the trial court held that the restriction on the cross-examination of Salzenstein was not prejudicial, but, in fact, the jury could well have drawn reasonable inferences from his testimony which would have been helpful to the cause of the appellants.

Evidence may be excluded on the ground of surprise under sec. 904.03, Stats.:

"*904.03* **Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

In *Fredrickson v. Louisville Ladder Co.*, 52 Wis.2d 776, 191 N.W.2d 193 (1971), this court recognized that the trial court has the discretion to exclude the testimony of a witness if a party is prejudiced by opposing counsel's failure to inform him that the witness would be called. The court said two questions would be considered, first, whether the party had reason to believe the witness would be called, and second, whether the unfair surprise outweighed the probative value. The court added that excluding a witness is a drastic measure which can be avoided by giving the surprised party time to prepare.

In *Fredrickson* the trial court gave the party time to depose the surprise witness during trial even though they moved for exclusion, not continuance. This court concluded the party had not been prejudiced.

In *State v. O'Connor*, 77 Wis.2d 261, 252 N.W.2d 671 (1977), this court again said that a continuance was the more appropriate remedy for surprise and that exclusion should be considered only if a continuance would result in an unusually long delay.

In determining whether the trial court abused its discretion in refusing to exclude the testimony this court will consider the reasons the trial court gave for its ruling, as well as the opportunity the surprised party has had to evaluate the surprise testimony and the extent to which the surprised party has been able to cross-examine concerning the surprise testimony. *O'Connor, supra; State v. Johnson*, 74 Wis.2d 26, 245 N.W.2d 687 (1976); *Featherly v. Continental Ins. Co.*, 73 Wis.2d 273, 243 N.W.2d 806 (1976); *Bublitz v. Lindstrom*, 17 Wis.2d 608, 117 N.W.2d 636 (1962).

In the instant case one of appellants' lawyers knew two weeks before trial that Annetsberger had retained the expert who might testify. The other lawyer was informed of this expert the Saturday before the trial commenced. Both admitted they did not object to his testimony when informed he would testify. Further at no point did appellants' counsel indicate they were unprepared to handle Salzenstein's testimony, and neither ever requested a continuance. Rather their primary objection is that Salzenstein was not permitted to testify, on cross-examination, regarding the claim of the appellants against ITT and Ranco for the allegedly defective components supplied by them.

The scope of cross-examination is also within the control of the trial court. *Neider v. Spoehr*, 41 Wis.2d 610, 165 N.W.2d 171 (1969), states:

"It is equally fundamental that a party has the right to cross-examine witnesses who testify against him. However, this right is not without limitations, and the extent of the manner and even the right of multiple cross-examination by different counsel representing the same party can be controlled by the trial court so that the trial proceeds in an orderly and fair manner. The exercise of discretion by the trial court to deny or restrict cross-examination must be dependent upon the circumstances of the trial. This court will not reverse unless it clearly appears that the trial court abused its discretion and that the error affected a substantial right of the complaining party and probably affected the result of the trial." *Id.* at 617, 618.

The appellants here were permitted to cross-examine Salzenstein regarding the evidence he did present regarding the fryer. However, since the trial court properly prevented Annetsberger from having Salzenstein testify regarding the components supplied by ITT and Ranco, appellants could not extend their cross-examination to these same issues.

On cross-examination the appellants were able to elicit the fact that the opinions of Salzenstein were based on viewing photographs of the scene, his visual inspection of the parts of the fryer, Tendick's report and his observation after being present in court during the trial. Appellants are persistent in their argument that their cross-examination was not thorough and was improperly restricted because they were prevented from cross-examining Salzenstein about the allegedly defective components supplied by ITT and Ranco. In our opinion, the cross-examination was thorough as it concerned the limited scope of his direct testimony.

From our review of the record the trial court, in the exercise of its discretion, could well have entirely prohibited the testimony of Salzenstein. This issue would then have been avoided. This is particularly so when

his testimony was not particularly helpful to either the appellants or Annetsberger. However, the arrangement made by the trial court in regard to the testimony of this witness was satisfactory when considering the situation presented to the trial court by the varying positions of the parties. The appellants did not request a continuance, and on appeal they have not suggested that a continuance was necessary to allow them to prepare for Salzenstein's limited testimony. It is our conclusion that the trial court did not commit prejudicial error or abuse its discretion in its rulings as to the presentation of the testimony of this witness.

*By the Court.*—Judgment affirmed.